Harold THOMAS, dba Allison Ranch and Cook Ranch, et al., Plaintiffs-Appellants,

v.

R. Max PETERSON, in his official capacity as Chief of the United States Forest Service, Defendant-Appellee,

and

Inland Forest Resource Council, a Montana corporation, et al., Defendants/Intervenors-Appellees.

No. 84–3887.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1984.

Decided Feb. 11, 1985.

---

Michael Axline, Pacific Northwest Resources Clinic, Eugene, Or., for plaintiffs-appellants.

Albert M. Ferlo, Jr., Dept. of Justice, Washington, D.C., Hugh O'Riordan, Boise, Idaho, for defendant-appellee.

Before WRIGHT, SNEED, and ALARCON, Circuit Judges.

SNEED, Circuit Judge:

Plaintiffs sought to enjoin construction of a timber road in a former National Forest roadless area. The District Court granted summary judgment in favor of defendant R. Max Peterson, Chief of the Forest Service, and plaintiffs appealed. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

We conclude that: (1) The National Environmental Policy Act (NEPA) requires the Forest Service to prepare an Environmental Impact Statement (EIS) that analyzes the combined environmental impacts of the road and the timber sales that the road is designed to facilitate. (2) The National Forest Management Act (NFMA) does not forbid construction of a timber road the cost of which exceeds the value of the timber that it accesses. (3) The Endan-

gered Species Act (ESA) requires the Forest Service to prepare a biological assessment to determine whether the road and the timber sales that the road is designed to facilitate are likely to affect the endangered Rocky Mountain Gray Wolf, and construction of the road should be enjoined pending compliance with the ESA.

## I.

### *Statement of the Case*

This is another environmental case pitting groups concerned with preserving a specific undeveloped area against an agency of the United States attempting to obey the commands given it by a Congress which is mindful of both environmentalists and those who seek to develop the nation's resources. Our task is to discern as best we can what Congress intended to be done under the facts before us.

Plaintiffs—landowners, ranchers, outfitters, miners, hunters, fishermen, recreational users, and conservation and recreation organizations—challenge actions of the United States Forest Service in planning and approving a timber road in the Jersey Jack area of the Nezperce National Forest in Idaho. The area is adjacent to the Salmon River, a congressionally-designated Wild and Scenic River, and is bounded on the west by the designated Gospel Hump Wilderness and on the east by the River of No Return Wilderness. The area lies in a "recovery corridor" identified by the U.S. Fish & Wildlife Service for the Rocky Mountain Gray Wolf, an endangered species.

The Jersey Jack area was originally part of the larger Gospel Hump roadless area, but when Congress created the Gospel Hump Wilderness in 1978, see Pub.L. 95–237, § 4, 92 Stat. 40, 43, it did not include the Jersey Jack area. The Forest Service's Roadless Area Review and Evaluation (RARE II) in 1979 recommended that the Jersey Jack area be managed as non-wilderness. (For a discussion of RARE II, see *California v. Block*, 690 F.2d 753, 758 (9th Cir.1982).) In 1980, Congress passed the Central Idaho Wilderness Act, Pub.L. 96–

312, 94 Stat. 948, which created the River of No Return Wilderness to the east of the Jersey Jack area, but left the Jersey Jack area as non-wilderness. The Act stated as one of its purposes to assure that "adjacent lands better suited for multiple uses other than wilderness will be managed by the Forest Service under existing laws and applicable land management plans." 94 Stat. 948.

In 1974, the Forest Service had produced the Nezperce Combined Timber Management Plan and Forest Road Program for the entire Nezperce National Forest. That Plan stated that some timber harvesting would take place in the Jersey Jack area, but did not discuss the proposed road. An EIS accompanied the Plan, but that EIS did not purport to satisfy the requirements of NEPA for individual areas within the National Forest. Instead, it stated that a "unit plan" would be prepared for each area, and that an EIS would accompany each unit plan. It further stated that roadless areas would not be developed until unit plans were prepared.

Subsequently, the Forest Service prepared ten unit plans and accompanying EIS's for areas in the Nezperce Forest. No unit plan, however, was prepared for the Jersey Jack area.

In 1976, Congress passed the National Forest Management Act. *See* 16 U.S.C. §§ 1600–1614. Pursuant to that Act, the Forest Service replaced the unit planning process with a single planning process for the entire Nezperce Forest. The Forest Service is presently preparing a Forest Management Plan and accompanying EIS, but neither the plan nor the EIS was complete at the time that this appeal was filed.

After the passage of the Central Idaho Wilderness Act, the Forest Service, in keeping with its earlier expressed intention, proceeded to plan timber development in the Jersey Jack area. In November, 1980, the Forest Service solicited public comments and held a public hearing on a proposed gravel road that would provide access to timber to be sold. The Forest Service pre-

pared an environmental assessment (EA), *see* 40 C.F.R. § 1508.9 (1984), to determine whether an EIS would be required for the road. Based on the EA, the Forest Service concluded that no EIS was required, and issued a Finding of No Significant Impact (FONSI), *see* 40 C.F.R. § 1508.13. The FONSI and the notice of the Forest Supervisor's decision to go ahead with the road were issued in a single document on February 9, 1981. The decision notice stated that "no known threatened or endangered plant or animal species have been found" within the area, but the EA contained no discussion of endangered species.

The EA for the road discussed only the environmental impacts of the road itself; it did not consider the impacts of the timber sales that the road was designed to facilitate. Subsequently, on November 23, 1981, and on June 30, 1982, the Forest Service issued EA's for, and approved, two of the timber sales. An EA for a third timber sale was also issued prior to the commencement of this action in district court. Each EA covered only the effects of a single timber sale; none discussed cumulative impacts of the sales or of the sales and the road. Each EA resulted in a FONSI, and therefore no environmental impact statements were prepared.

The plaintiffs appealed the Forest Supervisor's decision on the road to the Regional Forester, who affirmed the decision on May 26, 1981. The Regional Forester's decision was then appealed to the Chief of the Forest Service, who affirmed the decision on November 24, 1981.

The plaintiffs filed this action, challenging the Chief's decision, on June 30, 1982. Their three principal allegations are:

(1) NEPA, and regulations issued by the Council on Environmental Quality (CEQ), require the Forest Service to prepare an EIS that analyzes the combined effects of the proposed road and the timber sales that the road is designed to facilitate.

(2) The decision to build the road is inconsistent with the National Forest Management Act, 16 U.S.C. §§ 1600–1614, because the cost of the road will exceed the value of the timber that it will access.

(3) The road is likely to affect the Rocky Mountain Gray Wolf, an endangered species, and the Forest Service has failed to follow procedures mandated by the Endangered Species Act, 16 U.S.C. §§ 1531–1543.

After briefing and oral argument, the district court granted summary judgment for the Forest Service on all claims. *Thomas v. Peterson,* 589 F.Supp. 1139 (D. Idaho 1984) (hereinafter cited as Memorandum Decision). On the first claim, the court was "unable to find that the decision to build the road in question is anything more than a decision to build a forest road" and that an EIS covering both the road and the timber sales "would require needless speculation." Memorandum Decision at 1147, Excerpts of Record (E.R.) 97. On the second claim, the court found that the National Forest Management Act did not contain a clear mandate that the economic benefits from forest roads exceed their costs. *Id.* at 1151, E.R. 107. On the third claim, the court found that, although the Forest Service had not complied with the procedural requirements of the Endangered Species Act, it had "undertaken sufficient study and action to further the purposes" of the Act, *id.* at 1149, E.R. 103, and the court therefore declined to enjoin construction of the road. We shall discuss each of the three claims.

## II.

### *The NEPA Claim*

The central question that plaintiffs' NEPA claim presents is whether the road and the timber sales are sufficiently related so as to require combined treatment in a single EIS that covers the cumulative effects of the road and the sales. If so, the Forest Service has proceeded improperly. An EIS must be prepared and considered by the Forest Service before the road can be approved. If not, the Forest Service

may go ahead with the road, and later consider the environmental impacts of the timber sales.[1]

Section 102(2)(C) of NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1982). While it is true that administrative agencies must be given considerable discretion in defining the scope of environmental impact statements, see Kleppe v. Sierra Club, 427 U.S. 390, 412–415, 96 S.Ct. 2718, 2731–2733, 49 L.Ed.2d 576 (1976), there are situations in which an agency is required to consider several related actions in a single EIS, see id. at 409–410, 96 S.Ct. at 2729–2730. Not to require this would permit dividing a project into multiple "actions," each of which individually has an insignificant environmental impact, but which collectively have a substantial impact. See Alpine Lakes Protection Society v. Schlapfer, 518 F.2d 1089, 1090 (9th Cir. 1975).

Since the Supreme Court decided the Kleppe case, the Council on Environmental Quality (CEQ) has issued regulations that define the circumstances under which multiple related actions must be covered by a single EIS. The regulations are made binding on federal administrative agencies by Executive Order. See Exec. Order No. 11991, 3 C.F.R., 1977 Comp. 123 (1978); Andrus v. Sierra Club, 442 U.S. 347, 357–58, 99 S.Ct. 2335, 2340–41, 60 L.Ed.2d 943 (1979). The CEQ regulations and this court's precedents both require the Forest Service to prepare an EIS analyzing the combined environmental impacts of the road and the timber sales.

### A. CEQ Regulations

#### 1. Connected actions

The CEQ regulations require "connected actions" to be considered together in a single EIS. See 40 C.F.R. § 1508.25(a)(1) (1984). "Connected actions" are defined, in a somewhat redundant fashion, as actions that

"(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification." Id.

The construction of the road and the sale of the timber in the Jersey Jack area meet the second and third, as well as perhaps the first,[2] of these criteria. It is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales. This much is revealed by the Forest Service's characterization of the road as a "logging road," and by the first page of the environmental assessment for the road, which states that "[t]he need for a transportation route in the assessment area is to access the timber lands to be developed over the next twenty years." Moreover, the environmental assessment for the road rejected a "no action" alternative because that alternative would not provide the needed timber access. The Forest Service's cost-benefit analysis of the road considered the timber to be the benefit of the road, and while the Service has stated that the road will yield other benefits, it does not claim that

---

1. Defendant/Intervenor Inland Forest Resource Council describes the Central Idaho Wilderness Act, which left the Jersey Jack area among "adjacent lands better suited for uses other than wilderness," as a "congressional EIS." We cannot accept the suggestion that the Act exempts the Forest Service from full compliance with NEPA. The Act calls for management of nonwilderness lands "under existing laws," and contains no indication that such laws do not include NEPA.

2. Because, by the time this action was filed in district court, EA's were complete for three of the timber sales and at least two of the sales had been approved, at that time the Jersey Jack road arguably had come to meet the first of the three criteria, that is, that construction of the road would "automatically trigger" the timber sales. Forest Service documents in the record indicate that the two approved sales were awaiting only the approval and construction of the road before going forward. See E.R. 123, 126.

such other benefits would justify the road in the absence of the timber sales. Finally, the close interdependence of the road and the timber sales is indicated by an August 1981 letter in the record from the Regional Forester to the Forest Supervisor. It states, "We understand that sales in the immediate future will be dependent on the early completion of portions of the Jersey Jack Road. It would be advisable to divide the road into segments and establish separate completion dates for those portions to be used for those sales." E.R. 111.

We conclude, therefore, that the road construction and the contemplated timber sales are inextricably intertwined, and that they are "connected actions" within the meaning of the CEQ regulations.

### 2. Cumulative Actions

The CEQ regulations also require that "cumulative actions" be considered together in a single EIS. 40 C.F.R. § 1508.-25(a)(2). "Cumulative actions" are defined as actions "which when viewed with other proposed actions have cumulatively significant impacts." *Id.* The record in this case contains considerable evidence to suggest that the road and the timber sales will have cumulatively significant impacts. The U.S. Fish & Wildlife Service, the Environmental Protection Agency, and the Idaho Department of Fish & Game have asserted that the road and the timber sales will have significant cumulative effects that should be considered in an EIS. The primary cumulative effects, according to these agencies, are the deposit of sediments in the Salmon River to the detriment of that river's population of salmon and steelhead trout, *see* E.R. 41–44, and the destruction of critical habitat for the endangered Rocky Mountain Gray Wolf, *see id.* at 48–50. These agencies have criticized the Forest Service for not producing an EIS that considers the cumulative impacts of the Jersey Jack road and the timber sales. *See id.* at 57–58, 60, 62–64. For example, the Fish & Wildlife Service has written, "Separate documentation of related and cumulative potential impacts may be leading to

aquatic habitat degradation unaccounted for in individual EA's (i.e., undocumented cumulative effects).... Lack of an overall effort to document cumulative impacts could be having present and future detrimental effects on wolf recovery potential." *Id.* at 57–58. These comments are sufficient to raise "substantial questions" as to whether the road and the timber sales will have significant cumulative environmental effects. Therefore, on this basis also, the Forest Service is required to prepare an EIS analyzing such effects. *See Foundation for North American Wild Sheep v. United States Dept. of Agriculture,* 681 F.2d 1172, 1178 (9th Cir.1982); *City & County of San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980).

### B. Ninth Circuit Precedents

The conclusion that NEPA requires a single EIS that considers both road and sales is supported by our precedents. In *Trout Unlimited v. Morton,* 509 F.2d 1276 (9th Cir.1974), we addressed the issue of when subsequent phases of development must be covered in an environmental impact statement on the first phase. We stated that an EIS must cover subsequent stages when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." *Id.* at 1285. The dependency of the road on the timber sales meets this standard; it would be irrational to build the road and then not sell the timber to which the road was built to provide access.

The same principle is embodied in standards that we have established for determining when a highway may be segmented for purposes of NEPA. In *Daly v. Volpe,* 514 F.2d 1106 (9th Cir.1975), we held that the environmental impacts of a single highway segment may be evaluated separately from those of the rest of the highway only if the segment has "independent utility." 514 F.2d at 1110. *See also Lange v. Brinegar,* 625 F.2d 812, 815–816 (9th Cir.1980) (affirming the continuing validity of *Daly* ). In the light of *Trout Unlimited,* the

phrase "independent utility" means utility such that the agency might reasonably consider constructing only the segment in question. The Forest Service has not alleged that the Jersey Jack road has sufficient utility independent from the timber sales to justify its construction. Severence of the road from the timber sales for purposes of NEPA, therefore, is not permissible.

### C. *Timing of the EIS*

The Forest Service argues that the cumulative environmental effects of the road and the timber sales will be adequately analyzed and considered in the EA's and/or EIS's that it will prepare on the individual timber sales. The EA or EIS on each action, it contends, will document the cumulative impacts of that action and all previous actions.[3]

We believe that consideration of cumulative impacts after the road has already been approved is insufficient to fulfill the mandate of NEPA. A central purpose of an EIS is to force the consideration of environmental impacts in the decisionmaking process. *See, e.g., Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585 (9th Cir.1981); *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975); *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir.1974) (en banc); *Calvert Cliffs' Coordinating Committee v. AEC,* 449 F.2d 1109, 1113–1114 (D.C.Cir.1971). That purpose requires that the NEPA process be integrated with agency planning "at the earliest possible time," 40 C.F.R. § 1501.2, and the purpose cannot be fully served if consideration of the cumulative effects of successive, interdependent steps is delayed until the first step has already been taken.

The location, the timing, or other aspects of the timber sales, or even the decision whether to sell any timber at all affects the location, routing, construction techniques, and other aspects of the road, or even the need for its construction. But the consideration of cumulative impacts will serve little purpose if the road has already been built. Building the road swings the balance decidedly in favor of timber sales even if such sales would have been disfavored had road and sales been considered together before the road was built. Only by selling timber can the bulk of the expense of building the road be recovered. Not to sell timber after building the road constitutes the "irrational" result that *Trout Unlimited's* standard is intended to avoid. Therefore, the cumulative environmental impacts of the road and the timber sales must be assessed before the road is approved.

The Forest Service argues that the sales are too uncertain and too far in the future for their impacts to be analyzed along with that of the road. This comes close to saying that building the road now is itself irrational. We decline to accept that conclusion. Rather, we believe that if the sales are sufficiently certain to justify construction of the road, then they are sufficiently certain for their environmental impacts to be analyzed along with those of the road. *Cf. City of Davis v. Coleman,* 521 F.2d 661, 667–76 (9th Cir.1975) (EIS for a road must analyze the impacts of industrial development that the road is designed to accomodate). Where agency actions are sufficiently related so as to be "connected" within the meaning of the CEQ regulations, the agency may not escape compliance with the regulations by proceeding with one action while characterizing the others as remote or speculative.

Moreover, the record contains substantial evidence that the timber sales were in fact at an advanced stage of planning by the time that the decision to build the road was made. The Forest Service issued EA's for, and approved, two of the timber sales nine and sixteen months after it issued the road EA, and it had issued an EA for a third sale by the time that this action was filed. In fact, one of the Forest Service's own

---

**3.** The Forest Service's assurance that EA's on individual timber sales will address cumulative impacts is belied by the three timber-sale EA's in the record, none of which discusses cumulative impacts.

affidavits shows that the Service was preparing the EA on at least one of the sales at the same time that it was preparing the EA on the road. *See* Appellee's Supplemental Excerpts of Record at 65 (affidavit of Paul Moroz at 3). The record plainly establishes that the Forest Service, in accordance with good administrative practices, was planning contemporaneously the timber sales and the building of the road. Either without the other was impractical. The Forest Service knew this and cannot insist otherwise to avoid compliance with NEPA.

We therefore reverse the district court on the NEPA issue and hold that, before deciding whether to approve the proposed road, the Forest Service is required to prepare and consider an environmental impact statement that analyzes the combined impacts of the road and the timber sales that the road is designed to facilitate.[4]

### III

#### *The National Forest Management Act Claim*

The plaintiffs next allege, based on their own study and on a cost-benefit analysis prepared by the Forest Service, that the value of the timber to which the proposed road will provide access is less than the cost of the road. They claim that the construction of the road is therefore forbidden by the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600–1614, which states that "Congress declares that the installation of a proper system of transportation to service the National Forest System, as is provided for in sections 532 to 538 of this title, shall be carried forward in time

to meet anticipated needs on an economical and environmentally sound basis." 16 U.S.C. § 1608(a). The plaintiffs argue that a timber road is not economical within the meaning of the statute if its cost exceeds the value of the timber it accesses.

■ We disagree. The quoted section is worded as a declaration rather than a specific prescription. The statute does not define "economical." The sections to which the quoted section refers contain more specific requirements about forest road financing. *See* 16 U.S.C. §§ 535, 537, 538. None of those sections requires that the value of the accessed timber exceed the cost of the road. We must assume that if Congress wanted to include such a specific requirement it would have done so. *Cf. Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979).

Plaintiffs rely on 16 U.S.C. § 535, which authorizes three methods of financing National Forest roads: (1) appropriated funds; (2) requirements on purchasers of National Forest timber and other products; (3) cooperative financing with other public agencies and with private agencies or persons. That section also provides that

> where roads of a higher standard than that needed in the harvesting and removal of the timber and other products covered by the particular sale are to be constructed, the purchaser of the national forest timber shall *not* be required to bear that part of the costs necessary to meet such higher standard.

16 U.S.C. § 535 (emphasis added). From this negative command, plaintiffs infer an

---

**4.** Because we find that, independent of any wilderness potential that the Jersey Jack area may have, NEPA and the CEQ regulations require the Forest Service to prepare an EIS covering the cumulative impacts of the road and the timber sales, we need not decide whether a similar requirement is imposed by this court's decision in *California v. Block*, 690 F.2d 753 (9th Cir. 1982), which held inadequate the Forest Service's RARE II EIS and held that NEPA requires the Forest Service to evaluate and consider the wilderness values of roadless areas before they are developed. Whether *California v. Block* applies to the Jersey Jack area, and, if so, whether any EIS the Forest Service may prepare covering that area is sufficient in light of *California v. Block*, will be at issue if and when such EIS is completed and challenged.

The requirement of an EIS for the road and the timber sales may or may not be satisfied by the EIS the Forest Service is now preparing for the Nezperce Forest Management Plan. Since that EIS is not now complete, the issue of its sufficiency for purposes of the road and the timber sales is not before us.

underlying affirmative mandate that purchasers of timber *shall* be required to bear the entire cost of roads that are *not* built to higher standards than necessary for timber harvest and removal. The inference is unjustified. The authorization of the use of appropriated funds for road construction suggests that some roads may be built whose cost is not borne entirely by timber purchasers. Congress could reasonably have intended that the purchasers of timber might or might not be required to bear the cost of construction of any particular road, but that in no case should a purchaser be required to bear more than the cost of a road meeting the minimum standards for timber harvest and removal.

Plaintiffs also point to 16 U.S.C. § 472a(i), which is concerned with road construction for access to timber purchased by enterprises qualifying as "small business concerns" under the Small Business Act, 15 U.S.C. §§ 631 *et seq.* That section gives such small businesses the right to elect to have the Forest Service build roads for them under circumstances where ordinary purchasers would be required to build roads themselves.[5] Subsection 472a(i)(2) requires that when a small business makes such an election, "the price subsequently paid for the timber shall include all of the estimated cost of the road." Plaintiff's argue that this section requires small businesses to bear the cost of timber roads, and that Congress could not have intended that large businesses should bear less of a burden than small businesses.

The flaw in plaintiffs' argument is that section 472(a)(i)(2) is not a general requirement that small business purchasers of timber bear the costs of roads under all circumstances. It is only a requirement that such purchasers bear the costs under circumstances where larger purchasers are required to construct the roads themselves. It does not exclude the possibility that the Forest Service may construct some roads for which the purchaser, large or small, does not bear the entire cost.

Plaintiffs also cite Forest Service regulations, Congressional committee reports, Congressional testimony, unenacted bills, and Forest Service practices, all of which evince a concern for economically efficient management of the National Forests, for avoiding costs not justified by benefits, for obtaining fair market value in the sale of National Forest resources, and for recovery of the costs of National Forest roads and other management expenses. These sources merely counsel economic prudence. They do not evidence a statutory requirement that timber roads be built only when the proceeds of the timber sales will defray construction costs.

■ The Forest Service interprets "economical" to permit consideration of benefits other than timber access, such as motorized recreation, firewood gathering, and access to the area by local residents. An agency's interpretation of the statute that it is charged with administering is entitled to substantial deference, *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and will be upheld unless unreasonable, *see id.* at 18, 85 S.Ct. at 802. Here it is clearly reasonable.[6]

We therefore affirm the holding of the district court that the NFMA does not require that the cost of a National Forest timber road be exceeded by the value of the timber that it accesses.

---

**5.** Construction of a road by a purchaser of National Forest timber is known as "purchaser credit" construction. The cost of the road is deducted from the price that the purchaser pays for the timber. *See Timber Investors, Inc. v. United States,* 587 F.2d 472, 474 n. 1, 218 Ct.Cl. 408 (1978).

**6.** Our acceptance of the Forest Service's argument that the road will yield benefits other than timber access is not inconsistent with our holding that, apart from the timber sales, the Jersey Jack road does not have "independent utility" within the meaning of *Daly v. Volpe.* Benefits sufficient to account for the difference between road cost and timber value may be insufficient to establish the independent utility of a project for NEPA purposes. The Forest Service has not argued that it would have considered building the road were it not for the contemplated timber sales.

## IV.

### *The Endangered Species Act Claim*

The plaintiffs' third claim concerns the Forest Service's alleged failure to comply with the Endangered Species Act (ESA) in considering the effects of the road and timber sales on the endangered Rocky Mountain Gray Wolf.

The ESA contains both substantive and procedural provisions. Substantively, the Act prohibits the taking or importation of endangered species, *see* 16 U.S.C. § 1538, and requires federal agencies to ensure that their actions are not "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat of such species, *see* 16 U.S.C. § 1536(a)(2).

The Act prescribes a three-step process to ensure compliance with its substantive provisions by federal agencies. Each of the first two steps serves a screening function to determine if the successive steps are required. The steps are:

(1) An agency proposing to take an action must inquire of the Fish & Wildlife Service (F & WS) whether any threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1).

(2) If the answer is affirmative, the agency must prepare a "biological assessment" to determine whether such species "is likely to be affected" by the action. *Id.* The biological assessment may be part of an environmental impact statement or environmental assessment. *Id.*

(3) If the assessment determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with the F & WS. *Id.* § 1536(a)(2). The formal consultation results in a "biological opinion" issued by the F & WS. *See id.* § 1536(b). If the biological opinion concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id.* § 1536(a)(2), then the action may not go forward unless the F & WS can suggest an alternative that avoids such jeopardization, destruction, or adverse modification. *Id.* § 1536(b)(3)(A). If the opinion concludes that the action will not violate the Act, the F & WS may still require measures to minimize its impact. *Id.* § 1536(b)(4)(ii)–(iii).

Plaintiffs first allege that, with respect to the Jersey Jack road, the Forest Service did not undertake step (1), a formal request to the F & WS. The district court found that to be the case, but concluded that the procedural violation was insignificant because the Forest Service was already aware that wolves may be present in the area. The court therefore refused to enjoin the construction of the road. Plaintiffs insist, based on *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), that an injunction is mandatory once any ESA violation is found. Defendants respond, citing *Village of False Pass v. Clark,* 733 F.2d 605 (9th Cir.1984), that *TVA* applies only to substantive violations of the ESA, and that a court has discretion to deny an injunction when it finds a procedural violation to be *de minimis.*

We need not reach this issue. The Forest Service's failure goes beyond the technical violation cited by the district court, and is not *de minimis.*

Once an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment to determine whether the proposed action "is likely to affect" the species and therefore requires formal consultation with the F & WS. *See supra.* The Forest Service did not prepare such an assessment prior to its decision to build the Jersey Jack road. Without a biological assessment, it cannot be determined whether the proposed project will result in a violation of the ESA's substantive provisions. A failure to prepare a biological assessment for a project in an area in which it has been determined that an endangered species may be present cannot be considered a *de minimis* violation of the ESA.

The district court found that the Forest Service had "undertaken sufficient study and action to further the purposes of the ESA," Memorandum Decision at 1149, E.R. 103. Its finding was based on affidavits submitted by the Forest Service for the litigation.[7] *See* Memorandum Decision at 1148, E.R. 99. These do not constitute a substitute for the preparation of the biological assessment required by the ESA.

Given a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA. The procedural requirements of the ESA are analogous to those of NEPA: under NEPA, agencies are required to evaluate the environmental impact of federal projects "significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C); under the ESA, agencies are required to assess the effect on endangered species of projects in areas where such species may be present. 16 U.S.C. § 1536(c). A failure to prepare a biological assessment is comparable to a failure to prepare an environmental impact statement.

Our cases repeatedly have held that, absent "unusual circumstances," an injunction is the appropriate remedy for a violation of NEPA's procedural requirements."[8] *See Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984); *Alpine Lakes Protection Society v. Schlapfer,* 518 F.2d 1089 (9th Cir.1975); *Lathan v. Volpe,* 455 F.2d 1111, 1116–17 (9th Cir.1971). Ir-

reparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action. *Save Our Ecosystems,* 747 F.2d at 1250; *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 330 (9th Cir.1975). We see no reason that the same principle should not apply to procedural violations of the ESA.

The Forest Service argues that the procedural requirements of the ESA should be enforced less stringently than those of NEPA because, unlike NEPA, the ESA also contains substantive provisions. We acknowledge that the ESA's substantive provisions distinguish it from NEPA, but the distinction acts the other way. If anything, the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions. The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible. *See TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117.

The district court, citing *Palila v. Hawaii Dept. of Land and Natural Resources,* 639 F.2d 495 (9th Cir.1981), held that "[a] party asserting a violation of the

---

**7.** The district court relied on the Forest Service's assertion that it had worked in "close cooperation" with the F & WS, but that assertion is undermined by letters in the record from the F & WS indicating that the Forest Service had not consulted with the F & WS on the impact of the road and the timber sales on the gray wolf, and that the F & WS felt that the Forest Service was not giving the wolf adequate consideration. *See* E.R. 55–58.

**8.** The "unusual circumstances" that have led this court to refrain from enjoining a project from proceeding without compliance with NEPA have been the existence of irreparable harm that would flow from injunction of the project. *See American Motorcyclist Association v. Watt,* 714

F.2d 962 (9th Cir.1983) (injunction of implementation of Bureau of Land Management's California Desert Conservation Plan "would leave fragile desert resources vulnerable to permanent damage"); *Alpine Lakes,* 518 F.2d at 1090 (injunction against timbering would lead to damage of timber by insects, rendering it worthless). No similar irreparable harm has been alleged in this case. Moreover, *American Motorcyclist* and *Alpine Lakes* involved, respectively, a preliminary injunction, and an injunction pending appeal. In both cases, therefore, it was uncertain whether the plaintiffs would ultimately prevail on the merits. Here, the Forest Service's violation of the ESA has been conclusively established.

Endangered Species Act has the burden of showing the proposed action would have some prohibited effect on an endangered species or its critical habitat," and found that the plaintiffs in this case had not met that burden. Memorandum Decision at 1149, E.R. 102. This is a misapplication of *Palila*. That case concerned the ESA's prohibition of the "taking" of an endangered species, 16 U.S.C. § 1538(a)(1)(B), not the ESA's procedural requirements. Quite naturally, the court in *Palila* found that a plaintiff, in order to establish a violation of the "taking" provision, must show that such a "taking" has occurred. *See* 639 F.2d at 497. The holding does not apply to violations of the ESA's procedural requirements. A plaintiffs' burden in establishing a procedural violation is to show that the circumstances triggering the procedural requirement exist, and that the required procedures have not been followed. The plaintiffs in this case have clearly met that burden.

The Forest Service would require the district court, absent proof by the plaintiffs to the contrary, to make a finding that the Jersey Jack road is not likely to effect the Rocky Mountain Gray Wolf, and that therefore any failure to comply with ESA procedures is harmless. This is not a finding appropriate to the district court at the present time. Congress has assigned to the agencies and to the Fish & Wildlife Service the responsibility for evaluation of the impact of agency actions on endangered species, and has prescribed procedures for such evaluation. Only by following the procedures can proper evaluations be made. It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed. *Cf. City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975) (under NEPA, agency, not plaintiff, is responsible for investigating the environmental effects of a proposed action).

We therefore hold that the district court erred in declining to enjoin construction of the Jersey Jack road pending compliance with the ESA.

■ Finally, one additional development must be considered. The Forest Service's brief states that now a "biological evaluation" has been completed. The Service's memorandum opposing an injunction pending appeal states that the evaluation was completed on April 15, 1984, i.e., after oral argument in district court but before the court issued its decision. The brief claims that the evaluation concluded that wolves will not be affected if certain mitigation measures are taken. The Forest Service, however, has submitted the evaluation neither to this court nor to the district court, and the plaintiffs state in their brief that the Service has refused to show the evaluation to them. Obviously, therefore, this evaluation cannot serve as a basis for holding that the Forest Service has complied with the ESA. Should the Forest Service wish to enter its biological evaluation into the record, it will be for the district court to determine whether that evaluation is sufficient to satisfy the ESA's requirement of a biological assessment, and whether its preparation after the approval of the road can bring the Forest Service into compliance with the ESA. For this purpose, and for the purpose of fashioning an appropriate remedy for the Service's failure to comply with NEPA, we remand this case to the district court for proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.