Don VANCE and Save the Yaak
Committee, Plaintiffs,

v.

J.R. BLOCK, Secretary of Agriculture; R.
Max Peterson, Chief, Forest Service;
and Thomas Coston, Region I Forester,
Defendants.

No. CV–83–115–M.

United States District Court,
D. Montana,
Missoula Division.

April 25, 1986.

Charles Sheroke, Coeur d'Alene, Idaho, Karl J. Englund, Missoula, Mont., for plaintiffs.

George F. Darragh, Jr., Asst. U.S. Atty., Dist. of Montana, Great Falls, Mont., for defendants.

## MEMORANDUM

HATFIELD, District Judge.

On April 15 of this year, an order issued from this court denying plaintiffs' motion for summary judgment and granting defendants' cross-motion for summary judgment. This memorandum is rendered for the purpose of more fully relating this court's reasons for making that order.

Plaintiffs filed this complaint for declaratory and injunctive relief in August 1983.[1] Claims were made under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.;* the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.;* the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551 *et seq.;* and the regulations issued thereunder. Plaintiffs' application for a temporary restraining order, halting paving operations on a seventeen mile portion of the Yaak River Road, running from Porcupine Creek to Sullivan Creek, was denied, after hearing, on August 5, 1983. The appeal of the order denying the temporary restraining order was never perfected.

## NEPA CLAIM

As this court noted in the April 15 order, plaintiffs' primary focus in the initial stages of this case was on the reconstruction of the road itself. While timber sales allegedly intertwined with the road improvements were mentioned in the complaint, plaintiffs' main thrust was that the decision to pave the entire Yaak River Road was a "proposal for major federal action significantly affecting the quality of the human environment." As such, plaintiffs argued, defendants were obligated to prepare a full Environmental Impact Statement ("EIS"), instead of the less comprehensive Environmental Assessments which accompanied each proposal to pave a portion of this seventy mile road.[2]

NEPA mandates that each "major Federal action significantly affecting the quality of the human environment" be the subject of an EIS. 42 U.S.C. § 4332(2)(C). In deciding whether or not to prepare an EIS for a given project, the administrative agency involved must be given considerable discretion in defining the need for, and scope of, an EIS. *See, Kleppe v. Sierra Club,* 427 U.S. 390, 412–15, 96 S.Ct. 2718, 2731–33, 49 L.Ed.2d 576 (1976). The standard of review to be employed by this court is one of reasonableness—*i.e.,* this court

---

**1.** Plaintiffs' counsel implies, if not strongly contends, that this court somehow failed to give this case timely consideration. While indeed this matter is more than two and one-half years old, the court takes strong exception to any suggestion that this case was not handled as expeditiously as possible. Prior to May of 1985, this court carried a caseload that approached 800 pending actions. Despite this, plaintiffs were given a full day to present testimony in support of their motion for a temporary restraining order, just three days after the complaint was filed. An order denying the application followed within one day. A nine page memorandum of points and authorities setting out the court's reasons for the denial of injunctive relief was filed approximately one week later. The appeal of the order was never perfected by plaintiffs' counsel. A preliminary pretrial conference was conducted by the court in December of 1983. The discovery schedule promulgated at the conference was extended, in April, 1984, *at the request of plaintiffs' counsel.* While the motion for summary judgment was under

advisement, the Ninth Circuit Court of Appeals rendered its decision in *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985). In response to *Thomas,* plaintiffs renewed their application for injunctive relief. Rather than reconsider equitable remedies, this court, within four days, set a date for trial on the merits. Counsel was thus given a prompt opportunity to present his case. Counsel's suggestion that he was informed that disposition of this case would be made by a certain date is patently incorrect; it is this court's policy to make no such guarantees. Counsel's self-serving affidavits and statements that "it is unknown *if* this motion will be decided" are not only improper, but add nothing to this case. In all likelihood they should be stricken from the court record. In any event, Mr. Sherokee is advised that the *court* will manage its docket, not counsel.

**2.** Apparently one small section of the road was improved without having been subjected to an EA.

will uphold defendants' decision not to prepare an EIS unless that decision is unreasonable. *Found. for No. Amer. Wild Sheep v. Dept. of Ag.*, 681 F.2d 1172, 1177 (9th Cir.1982).

■ In reviewing the decision to forego preparation of an EIS, this court must consider whether plaintiffs have demonstrated that the road reconstruction proposal "may significantly degrade some human environmental factor." *Columbia Basin Land Protection Ass'n. v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.1981). Plaintiffs need only have raised substantial questions as to whether this project may have a significant effect on the human environment. *City & County of S.F. v. U.S.*, 615 F.2d 498, 500 (9th Cir.1980). The burden, of course, rests with the plaintiffs, to show that the resurfacing of the Porcupine-Sullivan Road may significantly undermine the human environment.

■ In the case *sub judice*, the Forest Service completed an Environmental Assessment ("EA") for the Porcupine-Sullivan Creek Road project. An EA serves as a vehicle for the determination of whether an EIS is required, for facilitating the preparation of an EIS if necessary, or for aiding an agency in discharging its NEPA-mandated duties if no EIS is required. 40 C.F.R. § 1508.9; 7 C.F.R. § 3100.20. Here, upon completion of, and consideration of, the EA, the Forest Supervisor determined that the repaving project's impacts were insignificant, and issued a "finding of no significant impact" ("FONSI"). This court must decide, in the first instance, whether the defendants took the requisite "hard look" at the environmental effects of this paving project, making its decision not to order an EIS reasonable. *Kleppe v. Sierra Club, supra*, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21.

While this court's order of August 5, 1983 was directed solely at plaintiffs' request for injunctive relief, many of the observations therein relate to the merits of the parties' cross-motions for summary judgment. Quite simply, this court deems reasonable the defendants' decision that

the paving project, standing alone, need not be subjected to the rigors of a full EIS. Because everyone seems to acknowledge that this is more properly a "cumulative effects" case, extended discussion of this point is unnecessary.

■ The court first notes that the plaintiffs did not appeal the May 19, 1982 decision and FONSI administratively. As this court observed when denying injunctive relief, plaintiffs' attack on the resurfacing project was far from timely. *See, generally,* Memorandum of August 16, 1983. While it was observed that laches is to be applied infrequently in environmental cases, *Coalition For Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980), courts are not foreclosed from applying the doctrine. *Lathan v. Volpe*, 455 F.2d 1111 (9th Cir.1971). Here, much of the preparatory work had been completed when suit was brought. Crews were at the job site. Both plaintiff Vance and his attorney were well aware of the proposed course of action with respect to the resurfacing well before it commenced. The final decision to resurface Porcupine-Sullivan, and the associated FONSI, was announced one year prior to suit being filed.

■ Plaintiffs' lack of diligence notwithstanding, the fact remains that the evidence adduced was insufficient to convince this court that the resurfacing project itself should trigger the EIS portion of NEPA. This roadway, in a lesser state, has existed since 1968. Resurfacing plans included no proposal for widening. Proposals for resurfacing most segments of the road were accompanied by an EA. The general character and design speed of this roadway were not altered by the paving project. The project here under scrutiny merely resulted in improved drainage, and placement of an asphalt mat on the base rock. This project, then, could reasonably be construed as not amounting to a major Federal action significantly affecting the human environment.

Further, the evidence belies plaintiffs' contention that the EA prepared for Porcu-

pine-Sullivan did not contain sufficient interdisciplinary input. Preparers of the EA consulted many individuals, including a wildlife biologist. The EA studied environmental effects on soil, watersheds, wildlife, recreation, and other factors. Of note is the fact that no comments were received on this EA.

As previously noted, the real crux of this case is whether the decision to improve this roadway, and the timber sales in the area, are "inextricably intertwined," necessitating combined treatment in a single EIS. Most recently, the Ninth Circuit Court of Appeals considered that very issue in *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985). *Thomas* involved a challenge by several environmental concerns to actions by the Forest Service in planning and approving a single lane, gravel road in a former National Forest roadless area located in the State of Idaho. In reversing the district court's grant of summary judgment on behalf of the Forest Service, the Circuit Court held that the road project and contemplated timber sales were "inextricably intertwined," were "connected actions," and would, in the court's view, "have cumulatively significant impacts." *Thomas*, 753 F.2d at 759. Accordingly, the Court of Appeals ordered preparation and consideration of an EIS that analyzed the combined impacts of the new road and the timber sales which, in the opinion of the court, the road was "designed to facilitate." *Id.*, at 761.

Shortly after *Thomas* was decided, plaintiffs renewed their application for a temporary restraining order, indicating the belief that this case was governed by the holding in the Idaho controversy. Rather than spending time considering such extraordinary, equitable relief, this court ordered a timely trial on the merits. So much did plaintiffs rely on *Thomas* that a proposed order submitted by them, prior to trial, merely mirrored the language and analysis used in that decision. For reasons more fully explained below, this court finds that the scenario which has unfolded in the Yaak differs from the *Thomas* situation in several critical respects.

The most basic distinction between the Yaak and the Jersey Jack area in *Thomas* is the fact that, while the Yaak area has been roaded since at least 1968, the Jersey Jack area was an unroaded, National Forest area. Consequently, a second, vital difference appears. In the Yaak, this road has existed and will exist in the area whether or not any new timber contracts are awarded. The route covered by the road has not changed in response to new timber contracts. In contrast, the Ninth Circuit placed considerable emphasis on the fact that the location, routing, construction techniques and other aspects of the Jersey Jack road was entirely dependent upon the location and timing of the timber sales. *Thomas*, 753 F.2d at 760. Here, the new surface has admitted benefits to timber haulers, in the form of decreased trucking expenses and equipment breakdowns. Yet the evidence at trial was unequivocal that timber harvests would continue in the Yaak with or without the asphalt surface. In addition, plaintiffs are unable to seriously undermine defendants' contention that this road serves interests other than those of the logging industry, since hunters, recreationalists, and local residents also use this road.

In *Thomas*, the court noted that a "no action" alternative discussed in the EA for the project would "not provide the needed timber access." *Thomas*, 753 F.2d at 758. As has already been stated, this is not the case in the matter at bar, since timber sales have proceeded and can continue to proceed without the asphalt surface. Essentially, the Yaak differs from the Jersey Jack situation because, in the former case, the road proposal is neither the first step in, nor a fully necessary prerequisite to, continued timber harvesting in the area. This is greatly different from the Jersey Jack roadless area, since one alternative available at the EA stage was "no action," *i.e.*, to build no road at all. That option, obviously, was not available here.

Against this factual background, this court can only conclude that the Yaak tim-

ber sales and road project are not "connected actions" requiring consideration in a single EIS. 40 C.F.R. § 1508.25(a)(1); *and see, Thomas,* 753 F.2d at 758. Nor can it be said, in view of the above, that the two events are "cumulative actions," actions which, when viewed together, have cumulatively significant impacts.

Logging has occurred in the area of the Yaak River Road since 1968. A comprehensive EIS and travel plan was prepared for the forest through which the road runs. Future timber sales will be subjected to analysis in EA's, and, if necessary, more complete EIS's. If the plaintiffs or others dispute the adequacy of any study made in conjunction with a given timber proposal, they are free to challenge the Forest Service actions administratively or judicially. It is this court's studied appraisal that any challenge to the construction of new spurs or secondary roads would best be made in conjunction with a challenge to the related timber sale. This court has insufficient proof before it to conclude that any spur roads being built or proposed should be studied in conjunction with the Yaak road resurfacing project. Current practice has been to study secondary road construction in conjunction with the associated timber sale. Plaintiffs have not appealed any decision to proceed with any timber sales or associated secondary road projects.

In summary, the plaintiffs have failed to demonstrate that the Yaak area timber sales, and this resurfacing project, are inextricably intertwined. There is obviously no evidence that any current timber contracts were "sufficiently certain" of being awarded when this road was completed in 1968, or improved, in several sections, several years ago. *Thomas,* 753 F.2d at 760. There is insufficient proof that the timber sales were at an "advanced stage of planning by the time the decision" to improve the road was completed. *Id.* The court's difficulty with plaintiffs' claim, as they attempt to come under *Thomas,* is one of remoteness in time. Which timber sales can or should be tied to the decision to improve Porcupine-Sullivan? Which plan or plans to improve various sections of the

Yaak River Road, since 1968, could be or should be tied to timber sales? Clearly, more of a nexus between paving and specific logging decisions must be made than plaintiffs have demonstrated. A great deal of time has elapsed between the beginning of reconstruction and current timber sales. That time, and the insufficiency of proof that the decisions were interrelated, is fatal to plaintiffs' NEPA claim.

## ENDANGERED SPECIES ACT CLAIM

■ The ESA prohibits federal agencies from taking actions which might jeopardize any endangered species, or alter its critical habitat. 16 U.S.C. § 1536(a)(2). Plaintiffs contend that the Forest Service violated the ESA by failing to adequately consider the effects of the road project, and allegedly related timber sales, upon the grizzly bear, gray wolf, and mountain caribou. This court's review of an agency's decision making processes having ESA ramifications is the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). *Stop H–3 Assoc. v. Dole,* 740 F.2d 1442 (9th Cir.1984).

■ Defendants admit that a detailed biological evaluation was not undertaken at the time the Porcupine-Sullivan EA was prepared. In all likelihood, that study should have been made at that time. Of note, however, is the fact that when the EA was issued in May of 1982, without the level of biological analysis plaintiffs deem appropriate, no appeal was taken. Thereafter, a detailed Biological Evaluation was completed, on June 3, 1983. That evaluation studied the cumulative impacts of the resurfacing projects on the entire road, including the Porcupine-Sullivan segment. The study concluded that the species listed by the U.S. Fish and Wildlife Service as possibly being present in the area would not be adversely affected by the project. The Fish and Wildlife Service was consulted about this conclusion, and concurred. It was not until the Forest Supervisor reaffirmed the Decision Notice and FONSI, on June 9, 1983, due to the addition of the Biological Evaluation, that the plaintiffs appealed the Forest Service decision.

While plaintiffs also attack the sufficiency of the Biological Evaluation, an attack which the evidence renders ill-founded, their primary complaint is with the timing of the study. The court agrees that a technical violation of the ESA may well have occurred. Unlike the situation in *Thomas,* however, the violation here does appear *de minimis.* A Biological Assessment had been undertaken on a nearby segment of this road in September of 1981. No affect on any endangered or threatened species was found. Porcupine-Sullivan had been determined, according to biologist Byars, to not contain a significant amount of suitable grizzly bear habitat. Evidence at trial established that while there was much speculation that this area was appropriate caribou habitat, the paucity of sightings of that animal placed the importance of this area, for that purpose, in considerable doubt. The June 3, 1983 comprehensive Biological Evaluation for each of the Yaak River Road segments, mentioned earlier, fully confirmed what the Forest Service had earlier believed, that these projects would not affect any endangered or threatened species. The court finds, first, that the timing of the Biological Evaluation did not, under the facts of this case, emasculate the ESA. The court further finds, under the deferential review prescribed in these cases, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), that the study and inquiries undertaken pursuant to the ESA were adequate, and further, that the decisions of the Forest Service, based on those studies and inquiries, were not arbitrary, capricious, nor contrary to law.

## OTHER CLAIMS

Neither the National Forest Management Act nor APA claims have been strenuously pursued. With regard to the latter claim, a few observations are appropriate. Plaintiffs' primary complaint in this regard is that they were not adequately advised of their appeal rights with respect to the Porcupine-Sullivan EA, Decision Notice, and FONSI. The Notice concededly did not make reference to appeal rights. However, plaintiffs demonstrated considerable familiarity with Forest Service laws and procedures. They were timely advised of their opportunity to comment on the Notice, but did not do so. Newsletters were sent and public meetings were held prior to preparation of the EA. The Decision Notice was properly posted for public perusal. Defendants corresponded and met with Don Vance on several occasions. The District Ranger even offered to attend a Save the Yaak Committee meeting, but was never invited. The APA is intended to promote the public's right to be heard. The spirit and the letter of that Act were observed by these defendants. Any minor errors in carrying out the mandate of the pertinent regulations were insignificant, and certainly cured by the fact the plaintiffs knew well in advance of Yaak River Road proposals.

## CONCLUSION

All claims for relief must be denied. This memorandum has been promulgated to set forth the court's reasoning behind the grant of summary judgment on defendants' behalf.