PREGERSON, Circuit Judge,
concurring in part and dissenting in part:
Respectfully, I dissent from Section VI of the majority opinion which makes it harder to protect the threatened Canada Lynx and its critical habitat, and puts the species at increased risk. I do not agree with the majority that Thomas v. Peterson, 753 F.2d 754 (9th Cir.1985) (“Thomas ”), should be put into the shredder by inferring that Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), and Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010), implicitly “undermine the theoretical foundation for our prior rulings on injunctive relief in Thomas and its progeny.” Maj. op. at 1090. I do not read Winter and Monsanto as casting a dark shadow on the ESA’s legislative purpose and our Ninth Circuit precedent. Winter and Monsanto are not “clearly irreconcilable” with Thomas as required for a three-judge panel to overturn settled Ninth Circuit case law. Miller v. Gammie, 335 F.3d 889, 900 (9th Cir.2003).
Winter and Monsanto focus on NEPA’s — not the ESA’s — standard for in-junctive relief. Winter and Monsanto do not address the ESA, which has a unique purpose and history, and still shines as the “most comprehensive legislation for the preservation of endangered species ever enacted by any nation.” Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon, 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).
The Supreme Court has carefully considered the ESA’s purpose and text in terms of a court’s equitable powers when faced with an ESA violation. See TVA v. Hill, 437 U.S. 153, 173, 193-95, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (finding that it was the plain intent of Congress in enacting the ESA to halt and reverse the trend towards species extinction, whatever the cost, and that an injunction was the appropriate remedy when a nearly-completed, multimillion-dollar dam threatened an en-' *1093 dangered snail darter and its critical habitat).
The Supreme Court examined congressional intent to understand how Section 7 of the ESA affected the courts’ equitable powers. Id. at 183-84, 98 S.Ct. 2279. Although the courts ensure compliance with the ESA, as the Supreme Court noted, “Congress had foreclosed the exercise of the usual discretion possessed by a court of equity.” Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Discussing Hill, the Ninth Circuit has observed that “[courts] have no expert knowledge on the subject of endangered species, much less do [they] have a mandate from the people to strike a balance of equities [against the interests of an endangered species].” Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir.1987) (internal citations omitted).
The majority asserts that “the ESA does not allow courts to put their thumb on the scales,” Maj. op. at 1090. But, I remain firmly convinced that “Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities.... ” Sierra Club, 816 F.2d at 1383. I agree with the Supreme Court that “[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than [those of the ESA].” Romero-Barcelo, 456 U.S at 313,102 S.Ct. 1798 (citing Hill, 437 U.S. at 173, 98 S.Ct. 2279).
The ESA commands federal agencies to “insure that any action authorized, funded, or carried out by [them] is not likely to jeopardize the continued existence of any endangered’ species or threatened species or result in the destruction or adverse modification of habitat of such species .... ” 16 U.S.C.A. § 1536. “The purpose and language of the statute under consideration in Hill, not the bare fact of a statutory violation, compel [an injunction in the face of an ESA violation that threatens critical habitat].” Romero-Barcelo, 456 U.S. at 314, 102 S.Ct. 1798. “In Congress’s view, projects that jeopardized the continued existence of endangered species threatened incalculable harm: accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species.” Sierra Club, 816 F.2d at 1383. Contrary to the majority, I agree with Ninth Circuit precedent holding that “[w]e may not use equity’s scales to strike a different balance.” Id.
The majority’s analogy between NEPA and the ESA fails to appreciate the critical difference between these statutes. The ESA’s statutory goal is to substantively provide for the conservation of endangered and threatened species and their ecosystems, 16 U.S.C.A. § 1531(b); whereas NEPA’s statutory goals are fundamentally procedural, and designed to create an environmental policy process that promotes the nation’s general welfare. 42 U.S.C. • § 4331; see Winter, 555 U.S. at 23, 129 S.Ct. 365 (remarking that “NEPA itself does not mandaté particular results. Instead, NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.” (internal citation and quotation marks omitted)).
The substantive purpose of the ESA, conserving endangered and threatened species and their ecosystems, justifies more protective processes than NEPA’s purpose, ensuring decision-makers have and consider all important information on environmental impacts. See Thomas, 753 F.2d at 764 (“If anything, the strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements, because the procedural requirements are designed to' ensure *1094 compliance with the substantive provisions.”)-
It is important to note that the majority opinion eliminates Thomas’s procedural protections as a global storm of extinction rages. See S.L Pimms et ah, The Biodiversity of Species and Their Rates of Extinction, Distribution, and Protection, 344 Science 1246752 (2014) (concluding that rates of extinction today are approximately 1,000 times the rate of extinction absent human action); Elizabeth Kolbert, The Sixth Extinction: An Unnatural History (2014). The uncertainty resulting from the majority opinion bodes ill for endangered species and the public.
A number of species at risk of extinction have been protected by Thomas’s holding, both in the Ninth Circuit and elsewhere. See, e.g., S. Yuba River Citizens League v. Nat’l Marine Fisheries Serv., 804 F.Supp.2d 1045, 1055 (E.D.Cal.2011) (protecting Chinook salmon, Central Valley Steelhead, and green sturgeon); Ctr. for Biological Diversity v. U.S. Forest Serv., 820 F.Supp.2d 1029, 1038 (D.Ariz.2011) (protecting the Mexican spotted owl and New Mexico ridge-nosed rattlesnake); Nat’l Wildlife Fed’n v. Nat’l Marine Fisheries Serv., 839 F.Supp.2d 1117, 1131 (D.Or.2011) (protecting several endangered species of salmon, including Chum, Chinook, Sockeye, and Coho salmon); Ctr. for Biological Diversity v. Bureau of Land Mgmt., No. C 0305509 SI, 2004 WL 3030209, at *6 (N.D.Cal. Dec. 30, 2004) (protecting the Mojave desert tortoise); Pac. Coast Fed’n of Fishermen’s Ass’ns v. U.S. Bureau of Reclamation, 138 F.Supp.2d 1228, 1248 (N.D.Cal.2001) (protecting the shortnose sucker and the Lost River sucker); Greenpeace v. Nat’l Marine Fisheries Serv., 106 F.Supp.2d 1066, 1073. (W.D.Wash.2000) (protecting the Stellar sea lion); Greenpeace Found. v. Mineta, 122 F.Supp.2d 1123, 1137 (D.Haw.2000) (protecting the Hawaiian monk seal); Florida Key Deer v. Brown, 386 F.Supp.2d 1281, 1291 (S.D.Fla.2005), aff'd sub nom. Florida Key Deer v. Paulison, 522 F.3d 1133 (11th Cir.2008) (protecting the Key Largo cotton mouse, Key Deer, Key Largo woodrat, Lower Keys marsh rabbit, Schaus’ swallowtail butterfly, silver rice rat, Stock Island tree snail, and Key tree-cactus).
Section VI of the majority opinion states that “[i]n light of the stated purposes of the ESA ...[,] establishing irreparable injury should not be an onerous task for plaintiffs.” Maj. op. at 1091. This may prove more difficult in practice than the majority assumes.
The majority opinion points to Nat’l Wildlife Fed’n v. Nat’l Marine Fisheries Serv., 839 F.Supp.2d 1117 (D.Or.2011), where a district court seemingly easily identified irreparable harm to endangered salmon species, to demonstrate that district courts will have no difficulty determining the existence of irreparable harm to a species and tailoring injunctions accordingly. Maj'. op. at 1091-92. Notably, the majority opinion fails to discuss the decades of scientific analysis needed for the district court to identify that harm, beginning with the 1991 listing of the Snake River sockeye salmon as an endangered species under the ESA. See, e.g., Nat’l Wildlife Fed’n v. Nat’l Marine Fisheries Serv., 2005 WL 1278878, at *22-32 (D.Or. May 26, 2005) (listing some of the scientific sources considered by the District Court of Oregon during National Wildlife Federation’s years of protracted litigation). A full review of the “Columbia basin salmon saga” demonstrates that the district court’s decades-long efforts to analyze the evidence of irreparable harm has resulted in judicial frustration and “status quo dam operations [that] largely continue to inflict high salmon mortalities” even “over two decades after a determination *1095 that more than a dozen species of Pacific salmonids require ESA protection.” Michael C. Blumm & Aurora Paulsen, The Role of the Judge in ESA Implementation: District Judge James Redden and the Columbia Basin Salmon Saga, 32 Stan. Envtl. L.J. 87, 148 (2013) (examining a “paradigmatic example of the limits of judicial review to effectuate real improvements in complex natural resources cases” despite' active managerial efforts by the district court).
The outcome of National Wildlife Federation is a good example justifying Thomas ’s holding that an injunction to protect endangered species and their critical habitat must come first.[1] Thomas’s holding remains one of the best guarantors of positive outcomes for threatened and endangered species.
Because I would follow settled precedent and protect the Canada Lynx and its critical habitat first, I would apply Thomas v. Peterson rather than finding it to be implicitly overturned as the majority does. Thus, I would grant Appellant’s request for an injunction pending compliance with the ESA’s Section 7 consultation requirements.

. The majority opinion also discusses South Yuba River Citizens League, 804 F.Supp.2d 1045, another ESA case involving the effect of dams on endangered salmon and other fish species, to demonstrate the ability of a district court to "address the evidence of harm and the relief requested, and grant[] an injunction to address the harm established by the evidence.” Maj. op. at 1091.
But a careful reading of South Yuba River finds that Thomas provided a critical function in that case, offering the district court a solid foundation for an injunction even when the "data and analysis necessary to determine what measures, precisely, are needed in order to avoid jeopardizing the listed species [were not provided by the government.]” 804 F.Supp.2d at 1055. Lacking this necessary information, the district court was able to “err on the side of a more protective injunction,” relying, in part, on Thomas’s holding that, had plaintiffs sought such a remedy, the court could "enjoin the new project entirely.” Id.