56 F.3d 1060
 40 ERC 1996, Util. L. Rep. P 14,048
 NORTHWEST RESOURCE INFORMATION CENTER, INC.; Oregon Natural
Resources Council, Inc.; Sierra Club;
Confederated Tribes and Bands of the
Yakima Indian Nation;
American Rivers,
Plaintiffs-Appellees,
and
State of Idaho, Department of Fish & Game,
Intervenor-Plaintiff-Appellee,
v.
NATIONAL MARINE FISHERIES SERVICE; U.S. Army Corps of
Engineers, Defendants-Appellants.
NORTHWEST RESOURCE INFORMATION CENTER, INC.; Oregon Natural
Resources Council, Inc.; Sierra Club;
Confederated Tribes and Bands of the
Yakima Indian Nation;
American Rivers,
Plaintiffs-Appellants,
and
State of Idaho, Department of Fish & Game,
Intervenor-Plaintiff-Appellant,
v.
NATIONAL MARINE FISHERIES SERVICE; U.S. Army Corps of
Engineers, Defendants-Appellees.
NORTHWEST RESOURCE INFORMATION CENTER, INC.; The Confederated Tribes and Bands of the Yakima Indian Nation; American Rivers; Oregon Natural Resources Council, Inc.; Sierra Club, Plaintiffs-Appellees,
v.
NATIONAL MARINE FISHERIES SERVICE; U.S. Army Corps of
Engineers, Defendants,
and
Public Power Council, Defendant-Intervenor-Appellant,
v.
STATE OF IDAHO, DEPARTMENT OF FISH & GAME,
Plaintiff-Intervenor-Appellee.
NORTHWEST RESOURCE INFORMATION CENTER, INC.; Oregon Natural
Resources Council, Inc.; Sierra Club;
Confederated Tribes and Bands of the
Yakima Indian Nation;
American Rivers,
Plaintiffs-Appellees,
v.
NATIONAL MARINE FISHERIES SERVICE; U.S. Army Corps of
Engineers, Defendants-Appellants,
v.
STATE OF IDAHO, DEPARTMENT OF FISH & GAME,
Plaintiff-Intervenor-Appellee,
and
Public Power Council, Defendant-Intervenor-Appellant,
and
Pacific Northwest Generating Cooperative,
Defendant-Intervenor-Appellant.
NORTHWEST RESOURCE INFORMATION CENTER, INC.; Oregon Natural
Resources Council, Inc.; Sierra Club;
Confederated Tribes and Bands of the
Yakima Indian Nation;
American Rivers,
Plaintiffs-Appellees,
v.
NATIONAL MARINE FISHERIES SERVICE; U.S. Army Corps of
Engineers, Defendants-Appellants,
v.
STATE OF IDAHO, DEPARTMENT OF FISH & GAME,
Plaintiff-Intervenor-Appellee,
v.
PACIFIC NORTHWEST GENERATING COOPERATIVE,
Defendant-Intervenor-Appellant,
and
Direct Service Industrial Customers (Aluminum Co. of
America, Atochem North America, Columbia Falls Aluminum
Company, Georgia-Pacific Corp., Kaiser Aluminum & Chemical
Corp., Intalco Aluminum Corp., et al.),
Defendants-Intervenors-Appellants.
 Nos. 94-35334, 94-35335, 94-35375, 94-35381 and 94-35382.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 8, 1995.
Decided June 1, 1995.
 
 Peter A. Appel, Dept. of Justice, Washington, DC, for defendants-appellants/cross-appellees.
 Daniel J. Rohlf, Portland, OR, for plaintiffs-appellees/cross-appellants.
 Appeals from the United States District Court for the District of Oregon.
 Before: HALL, O'SCANNLAIN, and RYMER, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 In this first of three related cases,[1] we are called upon to referee another round in the struggle between various federal agencies, environmental groups, fisheries interests, and electric power interests to come up with a viable program to preserve the dwindling stocks of wild salmon in the Columbia River and its tributaries in the Pacific Northwest. In this appeal, we must decide whether two federal agencies, the U.S. Army Corps of Engineers and the National Marine Fisheries Service, have complied with their duties under the National Environmental Policy Act and the Endangered Species Act in two of their efforts to preserve the salmon--river flow improvement measures and the transportation program for juvenile salmon.[2]
 
 
 2
 * The U.S. Army Corps of Engineers (the "Corps") operates certain dams, reservoirs, and other facilities in the Columbia and Snake River Basin that constitute the Federal Columbia River Power System ("FCRPS").[3] While the FCRPS has been an abundant source of inexpensive electricity to the region, it has also had drastic environmental impacts. "[I]t is generally accepted that the Basin's hydropower system is a major factor in the decline of some salmon and steelhead runs to a point of near extinction." N.W. Resource Information Ctr. v. N.W. Power Planning Council, 35 F.3d 1371, 1376 (9th Cir.1994) (quotation omitted). The dams kill some fish as a result of "[b]lockage and inundation of habitat, turbine-related mortality of juvenile fish, increased delay of juvenile migration through the Snake and Columbia Rivers, increased predation on juvenile salmon in reservoirs, and increased delay of adults on their way to spawning grounds." 57 Fed.Reg. 14,660 (1992).
 
 
 3
 The National Marine Fisheries Service ("NMFS") listed the Snake River sockeye salmon as an endangered species and the Snake River spring/summer and fall chinook salmon as threatened species under the Endangered Species Act in 1991 and 1992, respectively. This case focuses on measures implemented by the Corps to assist juvenile salmon in their downstream migrations.
 
 
 4
 Three major methods are employed to help juvenile salmon in their migrations--river flow improvement, spill control, and surface transportation. Each of these methods has its advantages and disadvantages, both for the salmon and the hydropower interests that benefit from the inexpensive electricity generated by the dams. First, the Corps can increase the amount of water released from storage reservoirs and thus increase the flow in the rivers. According to some scientific studies, increased flow decreases the time juvenile salmon spend migrating through the system and reduces their exposure to predators and other adverse effects of the system. The peak natural flow period is in the spring and early summer due to the winter runoff. Increased flow may be of greatest benefit to the juvenile salmon during their downstream migration, which varies from species to species but generally occurs in the spring and summer. However, increased flow in the winter is of greater benefit to the electric utilities because that is when the peak demand for electricity occurs. By adjusting the amount of water that is drawn down from the system of storage reservoirs, the Corps can control the timing and amount of flow to some extent.
 
 
 5
 Second, the Corps can increase the amount of water that spills over the spillways to allow more juvenile salmon to pass the dams without going through the turbines. Turbines kill or injure a significant number of juvenile salmon in their downstream migrations; thus, increased spill should increase salmon survival. According to some scientific studies, however, increased spill also causes the water to become supersaturated with nitrogen, which in turn may cause gas bubble disease in the fish. But there are economic consequences: water spilled over the spillways does not pass through the turbines and thus does not produce electricity.
 
 
 6
 Third, the Corps can physically transport juvenile salmon around the dams. The existing transportation program involves collecting juvenile salmon at four dams along the rivers, piping them into barges or trucks, and transporting them down the river past the dams to be released. According to some scientific studies, transportation decreases migration time and avoids exposure to predation and other adverse effects of the system. Critics, however, point to studies suggesting that the transportation program kills some juvenile salmon due to stress from crowding and increased disease transmission.
 
 
 7
 The Corps currently uses a "spread-the-risk" approach. All juvenile salmon that are collected at Lower Granite Dam (the dam farthest upstream) are transported downstream. At subsequent dams, when the flow in the river exceeds a certain rate which excess is predicted to prevail for at least five consecutive days, the Corps leaves the fish in the river instead of collecting them for transport. Otherwise, the Corps transports the juveniles collected at these dams to a point below Bonneville Dam (the dam farthest downstream) where they are reintroduced into the Columbia River. The transportation program began in the 1970s, and the Corps has operated it since 1981. The Corps transports approximately 20 million juvenile salmon per year, more than half the total number of migrating juveniles.
 
 
 8
 * The National Environmental Policy Act ("NEPA"), 42 U.S.C. Sec. 4321 et seq., requires federal agencies to prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the human environment." 42 U.S.C. Sec. 4332(2)(C). Often, an agency will first prepare an environmental assessment ("EA") to determine whether it needs to prepare a more detailed EIS. 40 C.F.R. Sec. 1508.9(a)(1). If the agency determines in the EA that the proposed action will not have a significant impact, it may issue a finding of no significant impact. If the proposed action will have a significant impact, the agency must prepare an EIS which addresses in detail the purpose and need for the action, the environmental impacts of the action, and alternatives to the action. 40 C.F.R. Sec. 1502.10. The purposes of an EIS are to provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process. Methow Valley Citizens Council v. Regional Forester, 833 F.2d 810, 814 (9th Cir.1987), rev'd on other grounds, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In addition, the agency may subsequently have to prepare a supplemental environmental impact statement ("SEIS") if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. Sec. 1502.9(c)(1)(ii).
 
 
 9
 In January 1992, in response to the listing of the salmon species and regional meetings held to address the problem, the Corps issued the Columbia River Salmon Flow Measures 1992 Options Analysis/Environmental Impact Statement ("OA/EIS"). The OA/EIS studied the environmental impacts of interim measures to improve flow that the Corps could implement in operational year 1992.[4] The Corps concluded that it would increase flow through a program of reservoir drawdown and flow augmentation. The Corps did not consider eliminating the transportation program in the range of options addressed by the OA/EIS because it believed the river system lacked the capacity to provide the necessary flows to maintain juvenile salmon survival at sufficient levels.
 
 
 10
 A year later, the Corps prepared a supplemental environmental impact statement. In March 1993, the Corps issued the Interim Columbia and Snake River Flow Improvement Measures for Salmon Final Supplemental Environmental Impact Statement ("1993 SEIS"), which evaluated measures to improve flow that could be implemented for the 1993 operational year and the short-term future. The 1993 SEIS incorporated the OA/EIS by reference. The preferred alternative recommended by the SEIS again involved increasing flow through a modified version of the 1992 operations. In evaluating the impacts of various flow alternatives, the Corps again assumed that the transportation program would continue as it had in the past and did not consider eliminating transportation as one of its options. The Corps issued its Record of Decision ("ROD") on the flow improvement measures on June 18, 1993. The Corps' decision not to address the transportation program in the 1993 SEIS is the first major subject of this appeal.
 
 B
 
 11
 The Endangered Species Act ("ESA"), 16 U.S.C. Sec. 1531 et seq., contains several substantive and procedural provisions designed to protect endangered species. These provisions are triggered when a species is listed as endangered or threatened. 16 U.S.C. Sec. 1533. Substantively, the ESA prohibits the "taking" of any listed species. 16 U.S.C. Sec. 1538(a)(1). "Taking" includes killing, harming, capturing, or collecting the species. 16 U.S.C. Sec. 1532(19). Under section 10 of the ESA, however, the Secretary (or in this case NMFS)[5] may permit certain "takings" of listed species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. Sec. 1539(a)(1)(A). In an application for a section 10 permit, an agency must submit a conservation plan that specifies the impact that will result from the taking as well as alternatives to the taking that were considered. 16 U.S.C. Sec. 1539(a)(2)(A). NMFS must provide an opportunity for public comment and make certain findings before approving the permit application. 16 U.S.C. Sec. 1539(a)(2)(B).
 
 
 12
 Because the transportation program involves the "taking" of listed species in the form of collection and transportation, the Corps is required to obtain a section 10 permit from NMFS. The Corps applied for and received a section 10 permit from NMFS for the 1992 operational year. In January 1993, the Corps again applied for a section 10 permit for operational year 1993. On April 14, 1993, NMFS responded by issuing the section 10 permit, a biological opinion ("BO"), and an environmental assessment ("EA"). The EA advised that no EIS was necessary for NMFS' decision to issue the permit and recommended a finding of no significant impact. The permit authorized the transportation program to proceed from March 25, 1993 to December 31, 1993. NMFS' decision to grant the permit is the second major subject of this appeal.
 
 C
 
 13
 On April 20, 1993, the Northwest Resource Information Center and other environmental organizations (collectively "NRIC") brought suit against the Corps and NMFS (collectively the "federal defendants") claiming: (1) NMFS violated the ESA when it issued the section 10 permit to the Corps; (2) the Corps violated NEPA in its 1993 SEIS because it failed to address the transportation program; and (3) NMFS violated NEPA in the EA it prepared in connection with the Corps' section 10 permit application.[6] The Idaho Department of Fish and Game ("Idaho") intervened as a plaintiff. The Pacific Northwest Generating Cooperative ("PNGC") and the Public Power Council ("PPC") (collectively the "Utilities"), and the Aluminum Company of America and other direct service industries (collectively the "DSIs") intervened as defendants.[7]
 
 
 14
 The parties filed cross-motions for summary judgment. On December 17, 1993, without a written opinion, the district court granted summary judgment for the defendants on the ESA and NEPA claims against NMFS. In a prior opinion denying NRIC's request for a preliminary injunction, the district court had held that "issuance of the permit is consistent with the underlying purposes of the ESA since the program is at least designed to enhance the species." N.W. Resource Information Ctr. v. National Marine Fisheries Serv., Civil No. 93-469-MA (D.Or. Apr. 30, 1993).
 
 
 15
 On December 22, 1993, in a written opinion, the court granted summary judgment for NRIC on its NEPA claim against the Corps. The district court held that the transportation program was a "connected action" to the flow improvement measures. Thus, "the [Corps] acted arbitrarily and capriciously when it excluded transportation from the scope of its SEIS for flow improvement measures." N.W. Resource Information Ctr. v. National Marine Fisheries Serv., Civil No. 93-870-MA (D.Or. Dec. 22, 1993). Both sides appeal.
 
 II
 
 16
 The federal defendants claim that the district court erred in its holding that the transportation program and the flow improvement measures were "connected actions." Consequently, the federal defendants argue, the Corps did not violate NEPA in its 1993 SEIS by failing to address the transportation program because it was not required to do so in the first place.
 
 
 17
 * Because NEPA contains no separate provision for judicial review, compliance with NEPA is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 706(2)(A). Sierra Club v. Penfold, 857 F.2d 1307, 1315 (9th Cir.1988). An agency's EIS (or SEIS) may thus be reversed or remanded only if it is arbitrary, capricious, or an abuse of discretion. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376-77, 109 S.Ct. 1851, 1860-61, 104 L.Ed.2d 377 (1989). However, this court still must ensure that the agency took a " 'hard look' at the environmental consequences of its action." Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir.1993).
 
 B
 
 18
 As a threshold matter, the federal defendants argue that NRIC has not challenged a "final agency action" as required by the APA, 5 U.S.C. Sec. 704. In their view, NRIC is really claiming that the Corps' decision not to prepare a SEIS for the transportation program for 1993 is arbitrary and capricious. However, the action they challenge--the Corps' 1993 SEIS and ROD--only effected changes in flow. Because there has been no action, event, or proposal with regard to the transportation program, they argue, there is no final agency action for NRIC to challenge.
 
 
 19
 Although the federal defendants may be correct that NRIC has launched a flank attack on the transportation program, their argument is flawed. First, their argument relies on a mischaracterization of NRIC's claim. As the district court stated, "plaintiffs do not claim ... that the [Corps] should have prepared an SEIS for transportation.... Instead, plaintiffs claim that the 1993 SEIS and subsequent Record of Decision for flow improvement measures were inadequate and that the SEIS should have addressed transportation impacts and alternatives." N.W. Resource Information Ctr., Civil No. 93-870-MA. In other words, NRIC is challenging the final agency action actually taken--the flow improvement measures--in the sense that the action may have been different if the SEIS on which it was based had considered the transportation program.
 
 
 20
 More importantly, the federal defendants' argument begs the question. This court must first determine whether the transportation program is a "connected action" to the flow improvement measures. If it is, NEPA requires it to be addressed in the same SEIS. If it is not, the federal defendants are probably correct that there is no final agency action to be reviewed at this time. See Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 235 (9th Cir.1990). NRIC may indeed have chosen the wrong agency action through which to challenge the transportation program, but this is not a question that can be answered without first determining if the transportation program is indeed a "connected action."
 
 C
 
 21
 As an additional threshold matter, the Utilities argue that NRIC has waived its right to object to the scope of the SEIS (i.e. the decision not to address the transportation program) because it failed to do so during the scoping process.[8] However, the SEIS itself states: "[T]he Corps received input at the July 1992 public information meetings that the SEIS should consider major changes to the transportation program and related actions to help fish passage. Similar input has been received over the years from a variety of sources." SEIS at 3-13. These July 1992 meetings were part of the "scoping process." Although the 1993 SEIS does not identify the particular groups that provided the input, it acknowledges receiving comments from "river user interests" and "organizations concerned about resources" regarding the scope of the SEIS and the juvenile salmon transportation program. SEIS at H-7.
 
 
 22
 In any event, the Utilities' waiver argument rests on shaky legal ground. In Oregon Natural Resources Council v. Marsh, 52 F.3d 1485, 1490 (9th Cir.1995), we stated: "[T]he Corps cannot forever omit a factor from the scope of an EIS solely because the factor was not raised as a concern during the scoping process. An agency preparing an EIS has a duty to assess, consider, and respond to all comments, even those relating to environmental factors not mentioned during the scoping process." Here, as the SEIS itself reveals, the Corps was well-aware of the criticisms of the scope of the SEIS before, during, and after the scoping process.
 
 D
 
 23
 We now turn to the merits of NRIC's claim that it was arbitrary and capricious for the Corps to exclude the transportation program from its 1993 SEIS. The "scope" of an EIS is defined as "the range of action, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R. Sec. 1508.25. Agencies should be given "considerable discretion" in defining the scope of an EIS. Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir.1985). However, an agency is required to consider more than one action in a single EIS if they are "connected actions," "cumulative actions," or "similar actions." 40 C.F.R. Sec. 1508.25. "Connected actions" are those which:
 
 
 24
 (i) Automatically trigger other actions which may require environmental impact statements.
 
 
 25
 (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.
 
 
 26
 40 C.F.R. Sec. 1508.25(a)(1). One rationale for requiring an agency to consider "connected actions" together in the same EIS is that, otherwise, an agency could divide a project into several smaller actions, each of which might have an insignificant environmental impact when considered in isolation, but which taken as a whole have a substantial impact. See Thomas, 753 F.2d at 758.
 
 
 27
 Here, the SEIS's stated purpose is to address interim measures to improve river flow for salmon. The transportation program is expressly excluded as "beyond the scope" of the SEIS. SEIS at 3-11. Whether the transportation program is a "connected action" to the interim flow measures is thus the critical question. If it is, then we must proceed to determine whether the SEIS is defective for failing to address it; if it is not, then the SEIS need only "briefly discuss" why it was eliminated from detailed study. 40 C.F.R. Sec. 1502.14(a). See also Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704 (9th Cir.1993).
 
 
 28
 Several principles can be gleaned from the Ninth Circuit cases addressing the issue of "connected actions." In Thomas, this court held that the construction of a road to facilitate logging and the sale of timber that would result from that logging were "connected actions" that had to be addressed in a single EIS. The court pointed out that "the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales." 753 F.2d at 758. Thus, the court concluded, the two actions were "inextricably intertwined." Id. at 759. See also Save the Yaak Comm. v. Block, 840 F.2d 714, 720 (9th Cir.1988).
 
 
 29
 On the other hand, in Sylvester v. U.S. Army Corps of Eng'rs, 884 F.2d 394, 400 (9th Cir.1989), this court, reviewing a preliminary injunction order, held that the plaintiff had not demonstrated a likelihood of success on his claim that the Corps must consider both the effects of a proposed golf course and the accompanying proposed resort in the same EIS. The court noted that "each could exist without the other, although each would benefit from the other's presence." Id. The court distinguished cases like Thomas as dealing with "links in the same bit of chain," whereas this case dealt with "separate segment[s] of chain." Id.
 
 
 30
 Similarly, in Trout Unlimited v. Morton, 509 F.2d 1276, 1285 (9th Cir.1974), the court stated that an EIS for a dam and reservoir project need not cover a second phase of the project, which called for disposition of part of the reservoir's irrigation capacity. The court found that the first phase was "substantially independent" of the second. The court stated that an EIS must cover subsequent phases of development only when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." Id. See also Daly v. Volpe, 514 F.2d 1106, 1110 (9th Cir.1975) (holding that impacts of a segment of a highway project could be considered separately from impacts of the rest of the highway because the segment had "independent utility").
 
 
 31
 The principles guiding these cases suggest that the flow improvement measures and the transportation program are not connected actions. The flow improvement measures and the transportation program do not present a "links in the same bit of chain" scenario like the logging road in Thomas. The Corps would continue the transportation program with or without flow improvements.[9] And, the Corps would explore flow improvements with or without the transportation program.[10] Thus, this case is like Sylvester and Daly in that the two actions have "independent utility." Either the transportation program or the flow improvement measures, standing alone, would benefit the salmon. To the limited extent the two actions are interconnected, this case echoes Sylvester in that "each could exist without the other, although each would benefit from the other's presence." Sylvester, 884 F.2d at 400.
 
 
 32
 To some extent, the two actions at issue in this case are unique in comparison to the types of actions typically addressed in EAs or EISs. Both the transportation program and the flow improvement measures are intended to benefit the environment. Ideally, the two actions together should have less of an impact on the environment. By contrast, the Ninth Circuit precedents deal with connected actions that have adverse impacts on the environment.
 
 
 33
 Nevertheless, we cannot agree with NRIC's argument, and the district court's conclusion, that the transportation program and the flow improvement measures are so interdependent as parts of the larger action of improving the survival of the salmon that they must be addressed in the same NEPA document.[11] On this rationale, measures involving harvest limits, hatchery releases, and habitat maintenance are also interdependent parts of every action taken to benefit the salmon. While we cannot allow an agency to segregate its actions in order to support a contention of minimal environmental impact, Thomas, 753 F.2d at 758, we also cannot force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once. To do so risks further paralysis of agency decisionmaking.
 
 
 34
 Because we hold that the transportation program and the flow improvement measures are not "connected actions," we are satisfied that the "brief discussion" of why alternatives involving changes to the transportation program were eliminated from detailed study fully complies with 40 C.F.R. Sec. 1502.14(a). Among other reasons, the SEIS explains: "[F]ish passage actions are undertaken through an established annual planning process that is fully coordinated among the Corps, BPA, NMFS, and the State fisheries agencies and tribes. The cooperating agencies for this SEIS see no benefit to opening a duplicative process to cover fish transportation issues." SEIS at 3-13 & App. H.
 
 III
 
 35
 NRIC claims that NMFS violated the ESA in issuing the section 10 permit for the transportation program and makes two primary arguments. First, NRIC argues that the transportation program is not a "conservation measure" within the meaning of the ESA because it is not "necessary." Second, NRIC argues that the record does not support NMFS' finding that the transportation program improves the chances of survival for the juvenile salmon.
 
 
 36
 As a threshold matter, we must determine whether NRIC's claim is moot. NRIC challenges an agency action that began and ended in 1993.[12] The section 10 permit at issue expired on December 31, 1993, and the transportation program is now operating under a new section 10 permit valid from April 1, 1994 to December 31, 1998. See 59 Fed.Reg. 30,572 (1994); 58 Fed.Reg. 65,702 (1993). Clearly, NRIC can no longer obtain any relief with regard to the transportation program for operational year 1993. "Where the activities sought to be enjoined have already occurred, and the appellate courts cannot undo what has already been done, the action is moot." Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th Cir.1978).
 
 
 37
 Although the mootness doctrine generally bars claims challenging an action that has already taken place, there is an exception for claims which "may be repeated and yet evade review." Alaska Fish & Wildlife Fed'n v. Dunkle, 829 F.2d 933, 939 (9th Cir.1987), cert. denied, 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988). See also Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 514-15, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Government actions fall within this exception if "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." Greenpeace Action v. Franklin, 14 F.3d 1324, 1329 (9th Cir.1992).
 
 
 38
 Greenpeace Action is instructive for this case. There, the plaintiffs brought a NEPA claim against the Pacific Fishery Management Council's total allowable catch ("TAC") regulation for pollock for the 1991 fishing season. Although the 1991 TAC had expired and a new TAC was in effect, the court held that the issue was not moot because it fell within the capable of repetition exception. The Greenpeace Action court focused on two factors. First, the challenged regulation was in effect for less than a year, making it difficult to obtain effective judicial review. Second, the major issue in the case was likely to recur because the agency had relied upon the same Biological Opinion for the 1992 TAC as it had for the 1991 TAC.
 
 
 39
 Here, the challenged section 10 permit was valid for less than one year (from March 25, 1993 to December 31, 1993). However, this permit was followed by a section 10 permit for the years 1994 to 1998. By contrast, in Greenpeace Action, the 1991 TAC was followed by subsequent TACs that were also of a seasonal duration. The five-year duration of the current section 10 permit affords a litigant more than adequate time to obtain judicial review.[13] In short, the challenges raised by NRIC concerning the section 10 permit for operational year 1993 do not evade review and are therefore moot.
 
 IV
 
 40
 Because we conclude there was no NEPA violation, we reverse the district court's grant of summary judgment for NRIC on its NEPA claim against the Corps and instruct the district court to enter judgment for the defendants on this claim. On NRIC's ESA claim against NMFS, we remand to the district court with instructions to vacate the judgment below and to dismiss the action as moot.
 
 
 41
 REVERSED in part and REMANDED in part with instructions to VACATE the judgment and to DISMISS the action as moot. Each side shall bear its own costs.
 
 
 
 [1]
 We also decide today two other matters arising from the federal agencies' activities with respect to the salmon--Idaho Dep't of Fish & Game v. Pacific N.W. Generating Coop., 56 F.3d 1071 (9th Cir.1995) and Aluminum Co. of America v. Bonneville Power Admin., 56 F.3d 1075 (9th Cir.1995)
 
 
 [2]
 Plaintiffs-appellants/cross-appellees' motion to supplement the record is denied; defendants-appellees/cross-appellants' motion to strike portions of the brief is granted
 
 
 [3]
 The Corps shares this responsibility to some extent with the U.S. Bureau of Reclamation and the Bonneville Power Administration
 
 
 [4]
 The Corps and other federal agencies had previously initiated long-term, system-wide studies, such as the System Operations Review and the System Configuration Study, to study long-term measures the Corps could take to improve operations of the hydrosystem
 
 
 [5]
 Responsibility for listed species is divided between the Secretary of the Interior and the Secretary of Commerce. 16 U.S.C. Sec. 1532(15). The Secretary of the Interior has delegated his responsibilities to the Fish & Wildlife Service. The Secretary of Commerce has delegated his responsibilities to NMFS. NMFS has the primary responsibility for the species in this case. 50 C.F.R. Secs. 222.23(a), 227.4(g), (h)
 
 
 [6]
 NRIC has not pursued this claim on appeal
 
 
 [7]
 PNGC is a power cooperative representing 29 rural electric cooperatives. PPC represents 114 consumer-owned electric utilities. PNGC's and PPC's members obtain their wholesale power from the Bonneville Power Administration ("BPA"), the federal agency that markets the hydropower generated by the dams in the FCRPS. The DSIs are various corporations that are directly-served customers of BPA. PNGC, PPC, and the DSIs have an interest in this case because it may affect the amount and timing of water flows, which in turn will affect their power supply and rates
 
 
 [8]
 The "scoping" process takes place as soon as practicable after a notice of intent to prepare an EIS has been published in the Federal Register. 40 C.F.R. Sec. 1501.7
 
 
 [9]
 The SEIS states: "NMFS has concluded that transport is beneficial to chinook and steelhead under all flow conditions...." SEIS at 2-15 (emphasis added)
 
 
 [10]
 Indeed, NRIC's ardent attacks on the transportation program demonstrate that it believes flow improvement is a goal independent of the transportation program
 
 
 [11]
 This is not to say that these actions are wholly unrelated. As NRIC points out, flow improvement measures and the transportation program are interdependent to the extent that flow levels trigger the transportation program. For example, the Corps' Annual Work Plan for Juvenile Fish Transport Operations states that chinook salmon will not be transported if flows exceed 220 thousand cubic feet per second (kcfs) at McNary Dam on the Columbia and 100 kcfs at Little Goose and Lower Monument Dams on the Snake
 
 
 [12]
 By contrast, the Corps' 1993 SEIS (discussed in Part II above) evaluated flow improvement measures for operational year 1993 and future years. Thus, that issue was not moot
 
 
 [13]
 Indeed, an indirect challenge to the transportation program for the years 1994 to 1998 has already been brought in the district court. American Rivers v. National Marine Fisheries Serv., No. 94-940-MA, 1995 WL 464544 (D.Or. Apr. 14, 1995)