**BENTON COUNTY, Plaintiff,**

v.

**U.S. DEPARTMENT OF ENERGY, a federal agency; Spencer Abraham, the Secretary of the U.S. Department of Energy; Richland Operations Office, a local Operations Office of the U.S. Department of Energy; and Keith A. Klein, the Manger for the Richland Operations Office of the U.S. Department of Energy, Defendants.**

**No. CT–02–5100–EFS.**

United States District Court, E.D. Washington.

Feb. 28, 2003.

Andrew Kelvin Miller, Benton County Prosecuting Attorney, Kennewick, WA, P. Stephen DiJulio, Foster Pepper & Shefelman PLLC, Seattle, WA, John C. Bolliger, David Law Offices, Pasco, WA, Sharon E. Cates, Foster Pepper & Shefelman PLLC, Seattle, WA, for Plaintiff.

William Herbert Beatty, U.S. Attorney's Office, Spokane, WA, John P. Almeida, U.S. Attorney General's Office, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Defendants.

## ORDER DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND EXTENDING INJUNCTION FOR 30 DAYS

SHEA, District Judge.

Before the Court is Plaintiff Benton County's Motion for Summary Judgment and for Permanent Injunction, (Ct.Recs.2, 14), and Defendants' Motion for Summary Judgment, (Ct.Rec.25). A hearing was held in this matter on February 25, 2003. John Bolliger represented Benton County ("County"). John Almeida, Robert Carosino, and Dale Jackson represented the Defendants.

The focal point of this suit is the scope of the environmental analysis required of the Department of Energy ("DOE") prior to deactivation of the Fast Flux Test Facility ("FFTF"). The FFTF is a nuclear test reactor facility located at Hanford near Richland, Washington. The FFTF operated from 1982 to 1992 to test a variety of materials in an environment where fast neutrons are used. The term "fast flux" in fact refers to the high energy speed of the neutrons in the reactor's core. While FFTF's original mission was to conduct research and to evaluate nuclear reactor fuels and fuel assembly materials, its mission broadened over the years to include a variety of tests for industry, medical isotope applications and research, nuclear power for space programs, and fusion research programs. FFTF's capability to produce medical and industrial isotopes and plutonium–238, an isotope used to power deep space probes, has continued to be of interest to the public including Benton County with an ongoing effort to gain DOE support for such FFTF missions.

In 1995, the DOE notified the public that it would prepare an Environmental Assessment (EA) to determine the environmental effects of deactivating the FFTF. The proposed deactivation would place the FFTF in a radiologically and industrially safe shutdown condition suitable for long-term surveillance and maintenance before final decontamination and decommissioning. A step in this process was to remove fuel and drain and de-energize the systems. The EA explained "[t]he decommissioning process for the FFTF would be accomplished in three phases: Phase I (Facility Transition), Phase II

(Surveillance and Maintenance), and Phase III (Disposition)." It further explained that this EA only addressed the actions associated with phases I and II.

The DOE concluded that the proposed action was not expected to impact the environment significantly, and on May 1, 1995, the DOE issued and published a Finding of No Significant Impact (FONSI). Benton County considered filing a lawsuit but did not after obtaining a promise from the then Secretary of DOE that the deactivation would be put on hold pending further discussion. No lawsuit challenging the 1995 EA or FONSI was filed at that time, though one could have been. DOE then continued to consider alternative uses for the FFTF, including tritium production for nuclear weapons, medical isotopes, plutonium–238 production, conversion of weapon-usable plutonium to a proliferation-resistant form, and other possible uses. FFTF supporters achieved some success, when in 1997, the DOE directed the FFTF to be maintained in a safe standby position, by ordering 23 of the 100 systems to be kept in a recoverable standby state.

On October 5, 1998, DOE published a notice of intent to prepare a programmatic environmental impact statement (PEIS) to research the possibility of using the FFTF to produce plutonium–238 for civilian space missions. In September 1999, the scope of the PEIS was expanded and a second notice of intent was published encouraging comments on other alternatives for the FFTF, such as medical isotope production and civilian nuclear energy research and development programs. This draft PEIS incorporated the 1995 EA concerning deactivation by reference, and stated that decommissioning was not addressed due to the uncertainty regarding the timing of such action and that an EIS would be completed prior to decommissioning.

The final EIS was issued in December 2000, concluding that the FFTF would not be restarted due to the failure to find a willing, viable business to purchase and/or operate the FFTF after restart. A Record of Decision ("ROD") was published on January 26, 2001. At that time, no one filed a lawsuit seeking review of these final administrative decisions. On April 25, 2001, the Secretary of Energy suspended the ROD for 90 days for the purpose of again analyzing the potential for either public or private sector continued operation of the FFTF for medical and industrial isotope production, plutonium–238 production for space missions and/or civilian nuclear energy research and development. Public interest was again solicited, and the DOE published a notice in the Commerce Business Daily. However, yet again, the DOE concluded that even though the public interest was strong, it was infeasible to restart the FFTF due to economic and legal issues. A ROD was entered on July 27, 2001, explaining DOE's findings and decision. At that time no one filed a lawsuit seeking review of that decision.

The DOE issued a notice to drain the FFTF's liquid sodium in September 2002 as part of the deactivation process. Because the drainage of the sodium will make restart practically impossible, the County filed this suit to obtain an injunction and to prevent DOE's drainage of the sodium prior to the preparation of an environmental impact statement addressing decommissioning of the FFTF. The DOE has agreed to maintain the current standby condition until March 12, 2003.

## A. County's Third Cause of Action

At the outset of the hearing, the County stated that it was persuaded by DOE's position and moved to dismiss its third cause of action claiming that the DOE had violated NEPA's tiering requirements. The Court **granted** the County's motion.

## B. Statute of Limitations and *Vermont Yankee*

Also at oral argument, the County also clarified that it was not substantively challenging the 1995 EA and FONSI. The County recognized that it had appeared to be making these challenges in its memorandum in support of its motion for summary judgment and in the response to the Defendants' motion, but clarified at the hearing that it was not doing so. Rather, the focus of the County's argument was that the DOE has begun engaging in decommissioning activities without an EIS and that new circumstances have arisen requiring DOE to supplement the EA, FONSI, and PEIS. For clarity of the record should this Order be appealed, the Court rules on the statute of limitation and *Vermont Yankee* affirmative defenses that the Defendants presented, finding that any challenge to the substance of the 1995 EA and FONSI is barred.

### 1. Statute of Limitations

An agency action must be challenged within six years of the time that the claim accrues. 28 U.S.C. § 2401(a), *Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir. 1988). Accordingly, if the County was to challenge the DOE's findings in the EA or FONSI, the County needed to file suit within six years of the publication of the FONSI, May 1, 1995. The FONSI was a final decision upon which "rights or obligations have been determined" and "legal consequences will flow." *See Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted); *Western Radio Serv. Co., Inc. v. Glickman,* 123 F.3d 1189 (9th Cir.1997); *Malama Makua v. Rumsfeld,* 136 F.Supp.2d 1155, 1162 (D.Hawai'i 2001). Plaintiff's November 8, 2002, suit is clearly late.

■ Furthermore, the Court finds that equitable tolling and equitable estoppel are inapplicable. The County did not present evidence that DOE engaged in affirmative misrepresentations. *See Socop–Gonzalez v. I.N.S.,* 272 F.3d 1176, 1184 (9th Cir. 2001); *Lehman v. United States,* 154 F.3d 1010, 1015 (9th Cir.1998); *Scholar v. Pacific Bell,* 963 F.2d 264, 267–68 (9th Cir. 1992). Rather, the County made a tactical decision to work with the DOE through the political channels. The County did not seek to obtain a waiver of the statute of limitations nor file a challenge in court. As a result, six years have passed since the issuance of the FONSI, and the County is barred from challenging the substance of the EA and FONSI. In addition, the Court finds that equitable estoppel does not stop the running of the state of limitations. The County did not present sufficient facts to create a genuine issue of material fact that DOE engaged in "affirmative conduct going beyond mere negligence." *See Lehman,* 154 F.3d at 1016–17 (quoting *United States v. Hemmen,* 51 F.3d 883, 892 (9th Cir.1995) (citations omitted)). The County raised no argument that any act of DOE, including the "promise" of the then Secretary of DOE to defer deactivation while exploring other missions for FFTF, caused the EA and FONSI to be unripe for review or that any lawsuit challenging the EA and FONSI filed before that "promise" would been moot thereby depriving the Court of subject matter jurisdiction. Nor given the sequence of events in this record, could it have. *See Malama Makua v. Rumsfeld,* 136 F.Supp.2d 1155 (D.Haw.2001) (containing an excellent discussion of these topics in the context of a NEPA challenge).

### 2. APA Comment Process

■ Under the rule established in *Vermont Yankee,* a plaintiff, or another, must bring sufficient attention to an issue to stimulate the agency's attention and consideration of the issue during the environ-

mental analysis comment process. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 550, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). A failure to do so bars judicial review. *City of Angoon v. Hodel,* 803 F.2d 1016, 1022 (9th Cir.1986). The 1995 EA clearly specified that the liquid sodium would be drained during deactivation. During the comment process for the EA, as well as that for the 2000 PEIS, the County did not argue that the drainage of the sodium coolant was decommissioning activity. Accordingly, the County's failure to comment during the EA and PEIS comment process, precludes it from arguing that the FONSI and PEIS were deficient for failing to address whether the drainage of the sodium is inextricably entwined with decommissioning.

## C. Scope of the Environmental Analysis

After the County clarified at oral argument that it was not challenging the substance of the 1995 EA and FONSI, the Court was left with only the following question: can DOE on the basis of its current NEPA record continue with deactivation? The Court answers this question affirmatively.

### 1. Standard

For an order granting a motion for summary judgment, the moving party must show that there is an absence of disputed issues of material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c). In other words, the moving party has the burden of showing that no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party opposing summary judgment must provide sufficient evidence supporting his/her claims to establish a genuine issue of material fact for trial.

*Id.; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment in the context of an Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, record review case allows the court to "decid[e] the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng. Co. v. Immigration and Naturalization Serv.,* 753 F.2d 766, 770 (9th Cir.1985).

### 2. Basic NEPA Requirements

■ Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370(d), in 1970. NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the quality of human environment." 42 U.S.C. § 4332(2)(C). NEPA is a procedural statute and does not require the agency to pursue a particular environmental action. Rather, the purpose of the act is to ensure that the agency is well informed and to involve the public and other government agencies in the information process. *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). Accordingly, the main purpose is to ensure that the agency takes a "hard look" at the environmental effects of their planned action. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992).

NEPA created the Counsel on Environmental Quality ("CEQ"), and provided CEQ with the power to implement guidelines for NEPA. 40 C.F.R. §§ 1500–1517. These guidelines are entitled to substantial deference. *Marsh,* 490 U.S. at 373, 109 S.Ct. at 1859. Under the guidelines, "major Federal actions" subject to NEPA include "new and continuing activities" with "effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

The first step for the agency is to prepare an Environmental Assessment ("EA") to determine whether the action will have a significant effect on the environment, if the agency's regulations do not categorically require or exclude the preparation of an EIS. 40 C.F.R. § 1501.4. An EA is a concise public document that is less comprehensive and less detailed than an EIS. 40 C.F.R. § 1508.9. An EIS is subsequently required if the EA determines that the agency's action "may have a significant effect upon the environment." If not, the agency must issue a FONSI, documenting why the action "will not have a significant effect on the human environment." 40 C.F.R. §§ 1508.13, 1509.13.

### 3. Scope: Connected Actions

The primary underlying dispute in this matter is whether deactivation and decommissioning are "connected" activities. The Court finds that they are not.

DOE's determination of the appropriate scope of the environmental review process and definition of terms is entitled to deference, unless it is arbitrary and capricious. *See Marsh*, 490 U.S. at 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377. However,

[a]lthough federal agencies are assigned the primary task of defining the scope of NEPA review and their determination is given "considerable discretion," connected or cumulative actions must be considered together to prevent an agency from "dividing a project into multiple actions," each of which individually has an insignificant environment impact, but which collectively have a substantial impact.

*Wetlands Action Network v. U.S. Army Corps of Eng.*, 222 F.3d 1105, 1118 (9th Cir.2000) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.1985)); *NW Res. Info. Center, Inc. v. Nat. Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir.1995). The guidelines define "connected actions" as actions which "(i) automatically trigger other actions which may require [EISs], (ii) cannot or will not proceed unless other actions are taken previously or simultaneously, [or] (iii) are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). "Cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2).

The DOE's definitions of deactivation and decommissioning treat deactivation and decommissioning as separate activities. When preparing the 1995 EIS and FONSI, DOE relied upon the definitions of deactivation and decommissioning in the Office of Environmental Restoration's Decontamination and Decommissioning Guidance Document ("Guidance Document"). In this Guidance Document, deactivation is defined as,

[t]he process of removing a facility from DOE operations, with the intent of conversion to another use or permanent shutdown; by the removal of fuel, draining and/or de-energizing of systems, removal of stored radioactive and hazardous materials and other actions to place the facility in a safe and stable condition so that a Surveillance and Maintenance program will prevent any unacceptable risk to persons or the environment until ultimate disposition of the facility.

Decommission is defined as:

The process of removing a facility from operation, followed by decontamination, SAFESTOR, entombment, dismantlement or conversion to another non-nuclear use. The process of removing a facility from further consideration for DOE reuse through a combination of actions, which may include decontamination and dismantlement, so that the facility poses no long-term unacceptable risk to persons or the environment. Decommissioning is the process for safely

removing a nuclear facility from service and reducing residual radioactivity to a level that permits release of the facility for unrestricted use and termination of the license.

These definitions highlight that deactivation and decommissioning are separate actions. Deactivation places the "facility in a safe and stable condition," whereas, decommissioning allows the facility to be released for unrestricted use and the license terminated. This Court is to defer to DOE's definitions, especially in the context of this highly scientific field. *See Marsh,* 490 U.S. at 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377.

■ In addition, the Court finds that both deactivation and decommissioning have independent utility. *See Wetlands Action Network v. U.S. Army Corps of Eng.,* 222 F.3d 1105 (9th Cir.2000); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir.1974). Deactivation's independent utility is placing the FFTF into a radiologically and industrially safe shutdown condition suitable for long-term surveillance and maintenance before final decontamination and decommissioning. This shutdown will allow the DOE to save approximately 30 million dollars per year. Decommissioning's independent utility is the ability to remove the FFTF from service and ensure that no long-term unacceptable risks exist to persons or the environment. As a result, the Court finds that it is not "unwise" or "irrational" to undertake deactivation without decommissioning until five, ten, or thirty years later, or never, given the financial savings of deactivating the FFTF. *See Wetlands Action Network,* 222 F.3d 1105, 1118; *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir.1974). Furthermore, deactivation does not have to occur "but for" decommissioning, and vice versa. *Cf. Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985). Deactivation can precede decommissioning, or decommis-

sioning can occur without initially placing a facility into a radiologically safe condition. In addition, the effects of both deactivation and decommissioning are not cumulatively significant. Because deactivation and decommissioning of the FFTF are not connected or cumulative activities, the 1995 EA and FONSI are sufficient, and an EIS addressing the effects of deactivation and decommissioning simultaneously is not required.

### 4. Supplementation

The County argued DOE failed to supplement its NEPA analysis for the following events: (1) Health and Human Services Secretary Thompson's October 8, 2002, letter to the DOE relating to the demand for medical isotopes, (2) the DOE has indicated that it will shut down the Plutonium Finishing Plant, and (3) transfer of the FFTF project from the Office of Nuclear Energy, Science, and Technology ("Office of Nuclear Energy") to the Office of Environmental Management. The Court finds that these three grounds are not "significant new events" requiring supplementation.

■ An agency's NEPA analysis must be supplemented if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). A supplement is not required if concerns are based partly on fact and partly on speculation. *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 380, 109 S.Ct. 1851, 1862, 104 L.Ed.2d 377 (1989). An agency's determination as to whether a supplement is required is controlled by the "arbitrary and capricious" standard. *Id.* at 376, 109 S.Ct. at 1860.

The substance of Secretary Thompson's letter was specifically addressed in the PEIS issued in 2000 and the subsequent analysis in the spring of 2001. The DOE

conducted an analysis on the feasibility of using the FFTF for production of medical isotopes, and concluded no. The Court finds that the DOE's decision was not arbitrary and capricious. *See Ariz. Cattle Growers' Ass'n v. Cartwright,* 29 F.Supp.2d 1100, 1116 (D.Ariz.1998).

Furthermore, the DOE has not finally decided whether the Plutonium Finishing Plant will be closed. Since this event has not occurred, the Court need not determine whether this is a significant circumstance because to do so would require speculation. *See Marsh,* 490 U.S. at 380, 109 S.Ct. at 1862. At such time, if ever, DOE decides to close PFP, DOE acknowledges that "DOE would need to satisfy all requirements under law, including those applicable under NEPA, prior to making such a decision." (Defs.' Mem. Supp. Summ. J. at 35, (Ct.Rec.26.)) That decision could then be the subject of a lawsuit seeking review thereof.

There is no evidence that transfer of the FFTF project from the Office of Nuclear Energy to the Office of Environmental Management, a divisional change, is a significant new circumstance relevant to NEPA analysis. *See Ariz. Cattle Growers' Ass'n,* 29 F.Supp.2d at 1118; *Swanson v. U.S. Forest Serv.,* 87 F.3d 339, 344 (9th Cir.1996).

For the reasons above, the Court finds that the DOE's decision to not supplement the 1995 FONSI or 2000 PEIS is not arbitrary and capricious.

### D. Challenges to Decommissioning

The Court finds arguments concerning decommissioning not ripe for review because there is no final agency decision to appeal. *Ohio Forestry Assoc., Inc., v. Sierra Club,* 523 U.S. 726, 732, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998); *West-*

*ern Radio Serv. Co. v. Glickman,* 123 F.3d 1189, 1197 (9th Cir.1997). The DOE acknowledges that it will have to prepare an EIS prior to deciding on a decommission plan.[1] 10 CFR Pt. 1021(d) App. D ¶ (d)(4). As of yet, DOE has not decided what the "end state" for the FFTF facility should be. The DOE personnel communication the County has pointed to is evidence that the DOE is only currently engaging in planning, and that no final decommissioning approach has been selected. Prior to committing any resources to any one of the options for decommissioning, the DOE must prepare an EIS. 40 C.F.R. § 1502.2(f). This ensures the opportunity for public comment. Upon completion of the EIS, DOE will have made a final decision on decommissioning that can be the subject of a lawsuit seeking court review.

### E. Injunction

The Court orders the injunction to remain in effect until 30 days after this Order is entered to allow the County with sufficient time to determine if it will appeal. After weighing the equities between the parties and giving due regard to the public interest, the Court finds that continuance of the injunction for thirty days, which is approximately two weeks after March 12, 2003, the date that DOE agreed to self enjoin till, is necessary in this instance given the almost irreversible consequences of draining the liquid sodium.

**IT IS HEREBY ORDERED:**

1. Plaintiff's third cause of action is **DISMISSED.**

2. Plaintiff's Motion for Summary Judgment and for Permanent Injunction, (Ct.Recs.2, 14), is **DENIED.**

---

1. "Classes of Actions That Normally Require EISs:" include "siting, construction, operation, and decommissioning of power reactors,

nuclear material production reactors and test and research reactors." 10 CFR Pt. 1021(d) App. D ¶ (d)(4).

3. Defendants' Motion for Summary Judgment, (Ct.Rec.25), is **GRANTED**.

4. The current injunction is continued and will expire **30 days after this Order is entered.**

**IT IS SO ORDERED.** The District Court Executive is directed to:

(1) Enter this Order,

(2) Provide copies to counsel,

(3) Enter Judgment in favor of all Defendants, providing that Benton County's Complaint is **dismissed with prejudice**, and

(4) **Close the file**, subject to reopening for good cause and for motions regarding the injunction.